# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY L. EARLE,<br><br>   *Plaintiff*,<br><br>v.<br><br>UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION,<br>100 F Street, NE<br>Washington, DC 20549,<br><br>WALTER JOSEPH CLAYTON III,<br>In his official capacity as Chairman of the<br>United States Securities and Exchange<br>Commission<br>100 F Street, NE<br>Washington, DC 20549,<br><br>SCOTT WALTER BAUGUESS,<br>In his official capacity as former Acting<br>Director of DERA in the United States<br>Securities and Exchange Commission<br>and as an individual<br>100 F Street, NE<br>Washington, DC 20549,<br><br>ROBERT MICHAEL WILLIS,<br>In his official capacity as Assistant<br>Director of the Office of Structured<br>Disclosure in the United States<br>Securities and Exchange Commission<br>and as an individual<br>100 F Street, NE<br>Washington, DC 20549,<br><br>and<br><br>KIMBERLY DEANNA CORONEL<br>In her official capacity as Managing<br>Executive in DERA's Office of the<br>Managing Executive in the United States<br>Securities and Exchange Commission | **COMPLAINT**<br><br><br><br>CASE NO.:<br>JURY TRIAL IS REQUESTED |

1

13492183v1

and as an individual                                    :
100 F Street, NE                                        :
Washington, DC 20549,                                   :
                                                        :
     *Defendants.*                                   :
                                                        :

## COMPLAINT

Plaintiff Kimberly L. Earle, by and through her undersigned counsel, brings this Complaint against

Defendants U.S. Securities & Exchange Commission (the "SEC" or "Agency") and its employees,

agents, and any successors in office, Walter Joseph Clayton, in his official capacity as Chairman

of the SEC, Scott Walter Bauguess, in his official capacity as former Acting Director of the

Division of Economic Risk Analysis ("DERA") within the United States Securities and Exchange

Commission and as an individual, Robert Michael Willis, in his official capacity as Assistant

Director of the Office of Structured Disclosure ("OSD") of DERA within the United States

Securities and Exchange Commission and as an individual, Kimberly Deanna Coronel, in her

official capacity as Managing Executive in DERA's Office of the Managing Executive and as an

individual, and in support thereof alleges the following:

## I.     SUMMARY OF ACTION

1.     This case involves multiple violations of Ms. Earle's federal constitutional rights, including

the illegal and wrongful termination of her federal employment effective on September 18, 2018,

by the SEC and individual Defendants.  Defendants repeatedly violated Ms. Earle's rights to

freedom of speech, due process under the U.S. Constitution, her right to be free from gender, age,

and religious discrimination, and her right to be free from retaliation.  Ms. Earle seeks to vindicate

her rights, require that Defendants not continue to violate her constitutional rights with impunity,

and obtain reinstatement to the position from which she was unlawfully terminated and restitution

of her lost pay and benefits.

13492183v1

2.      Ms. Earle was a permanent employee of the SEC from 1990 to 2018.  From August 2012 to September 18, 2018, Ms. Earle worked in OSD, which is one of a number of offices in the SEC's newest division, DERA.

3.      Ms. Earle has been continuously employed with the SEC for over twenty-eight (28) years and had never been reprimanded or received a negative review until she was arbitrarily terminated to suit the selfish whims of rogue public servants.   Indeed, in the two years preceding her termination, Ms. Earle was nominated for three awards related to accounting excellence.

4.      This lawsuit reveals how SEC managers' self-interests conflict with their obligations as "public servants," and how those conflicts enable SEC managers to commit illegal actions against other SEC employees to enhance their own interests while masking their actual reasons under the guise of the SEC's and the public's interest.

5.      From at least November 8, 2017 through September 18, 2018, and continuing to the present, Defendants violated and continue to violate federal constitutional, criminal, and civil law. Specifically, Defendants violated Ms. Earle's property right to continued federal employment absent misconduct or poor performance; her right to be free from a hostile work environment, gender discrimination, age discrimination, and religious discrimination; her right to participatory rather than pantomimic due process; and her right not to be retaliated against for exercising her protected right to file an Equal Employment Opportunity ("EEO") complaint regarding the discrimination she faced and exercising her protected right to file a whistleblower report. Defendants engaged in the following unlawful acts:

   a.      Consistent with the usual practice perfected by SEC management to target and then remove targeted SEC employees, Defendants misused the SEC's performance management system to claim that Ms. Earle's work performance had been

13492183v1

"unacceptable" as a pretext for removing her, followed by a "legal" threat to encourage Ms. Earle to resign "voluntarily" or be removed with near certainty and with adverse future consequences;

b.   Defendants retaliated against Ms. Earle because she had filed an employment discrimination complaint based on gender, age, and religious discrimination, against the SEC and certain DERA defendants named herein and identified below; and

c.   Defendants retaliated against Ms. Earle because she had distributed a memorandum detailing violations of applicable law and regulations as well as fraud and waste within and concerning the SEC's self-limiting operations despite its statutory mandates, namely, the Agency's non-investigation of the largest securities fraud (in impact) in the history of such frauds in the United States.

6.   All Defendants either made, accepted, acquiesced, or acted on the pretextual claim that Ms. Earle had performed "unacceptably" for FY 2017 and used the SEC's Office of General Counsel ("OGC") to effect Ms. Earle's removal without any substantive review of the genuine reason that had triggered the desire to remove her.

7.   Defendants' reason for weaponizing the SEC's performance management system to deprive Ms. Earle of her property right to federal employment, called a "slot," was to enable Defendants Bauguess and Willis to re-purpose that slot for a new senior officer ("SO") position in OSD to be filled by Defendant Willis, one week after the SEC, as a government agency, was prohibited by Executive Order from additional hiring and during a period when Defendant Clayton made internal statements that the SEC was $4 million short in funding for staff salaries.

8.   Defendants' decision to target Ms. Earle, as opposed to any of her peers in the same office

and at the same pay grade, was based on their animus toward older employees, women, and practitioners of Judaism.

9.      Ms. Earle brings this action to protect and vindicate her fundamental constitutional rights. This is a civil rights action brought under the Fifth and Fourteenth Amendments of the United States Constitution, Age Discrimination in Employment Act (29 U.S.C. §§ 621-634); Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981A; Whistleblower Protection Enhancement Act (5 U.S.C. 2302(b)(8)-(9)) challenging Defendants' termination of Ms. Earle and their restriction on Ms. Earle's rights, and other applicable laws. Ms. Earle brings this action to recover damages and for reinstatement by Defendant SEC, pursuant to 39 U.S.C. § 1209 and 29 U.S.C. § 185. Defendants have adopted a policy or set of policies that operates as an illegal restraint on Ms. Earle's right to free speech and to arbitrarily and capriciously deprive federal employees of their right to federal employment.

10.     In addition, the process followed by Defendants in terminating Ms. Earle's employment constituted an unlawful taking of property in violation of Ms. Earle's constitutional right to due process.

## II.     **BASES FOR JURISDICTION**

11.     This Court has subject matter jurisdiction of this action under one or more of the following sections of Title 28 of the United States Code:

  a.      Section 1331 ("original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States");

  b.      Section 1343(a)(4): ("original jurisdiction of any civil action authorized by law to be commenced by any person: ... To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights,

13492183v1

including the right to vote");

    c.    Section 1346(b)(1) ("Subject to the provisions of chapter 171 of this title ("exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."); and

    d.    Section 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Ms. Earle.")

12.    The SEC is an executive agency the United States Government formed in 1934 that exists to administer the federal securities laws and is headquartered in Washington, D.C.

13.    Ms. Earle was an employee of the SEC, working in the SEC's headquarters in Washington, D.C., continuously from August 1990 to September 2018.

### III.    <u>BASES FOR VENUE</u>

14.    Venue is proper in this Court pursuant to Title 28 of the United States Code in accordance with one or more of the following sections:

    a.    Section 1391(a)(1) ("This section shall govern the venue of all civil actions brought in district courts of the United States");

    b.    Section 1391(b)(2) ("a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is

13492183v1

the subject of the action is situated");

c.       Section 1391(e)(1)(B) or (C) ("A civil action in which a defendant is an officer or

employee of the United States or any agency thereof acting in his official capacity

or under color of legal authority, or an agency of the United States, or the United

States, may, except as otherwise provided by law, be brought in any judicial district

in which (A) a defendant in the action resides, (B) a substantial part of the events

or omissions giving rise to the claim occurred, or a substantial part of property that

is the subject of the action is situated, or (C) the Ms. Earle resides if no real property

is involved in the action. Additional persons may be joined as parties to any such

action in accordance with the Federal Rules of Civil Procedure and with such other

venue requirements as would be applicable if the United States or one of its officers,

employees, or agencies were not a party."); and

d.       Section 1395(a) ("A civil proceeding for the recovery of a pecuniary fine, penalty

or forfeiture may be prosecuted in the district where it accrues or the defendant is

found.").

15.       The events giving rise to Ms. Earle's causes of action occurred in the District of Columbia

and Defendant SEC and individual Defendants are either an agency of the United States or officers

or employees of an agency of the United States.

## IV.       PARTIES

## PLAINTIFF

16.       Plaintiff Kimberly L. Earle is a Jewish female born in 1963, a citizen of the United States,

and a resident of Fairfax County, Virginia.

13492183v1

17.     In 1985, Ms. Earle earned a bachelor's degree in business administration (B.B.A.) with a concentration in accounting from the College of William and Mary in Williamsburg, Virginia.

18.     In 1987, Ms. Earle became a certified public accountant ("CPA") with the Virginia Board of Accountancy.

19.     Ms. Earle has continuously remained an active CPA in the Commonwealth of Virginia.

20.     In 1990, Ms. Earle applied for employment with the SEC, at the SEC's "home office" or headquarters ("HQ") in Washington, DC.

21.     The SEC hired Ms. Earle as a staff accountant in the SEC's Division of Corporation Finance, at grade GS-13.

22.     Ms. Earle remained in the SEC, working in the Agency's HQ, continuously from July 1990 to September 2018, during which time she worked in the following SEC divisions:

     a.     Ms. Earle worked in the Division of Corporation Finance from July 1990 to September 1996.

     b.     Ms. Earle was promoted to SK-14 in 1992.

     c.     Ms. Earle then worked in the Division of Market Regulation, now called Division of Trading and Markets, from September 1996 to August 2012.

     d.     Ms. Earle next worked in DERA from August 2012 until September 30, 2018.

*23.*     In August 2012, Ms. Earle transferred to DERA as a senior staff accountant at grade SK-16, which was a promotion in grade level from SK-14.

24.     Ms. Earle's total and continuous period of SEC employment exceeded twenty-eight (28) years ("Ms. Earle's Tenure"), during which Ms. Earle: (1) had never been reprimanded in any way; and (2) had never received an "unacceptable" performance, other than the "unacceptable

performance" for FY 2017, which served as the SEC's pretext to terminate her employment with the Agency.

## DEFENDANTS

### U.S. Securities & Exchange Commission (SEC)

25.     Defendant SEC is an executive agency within the United States Government formed in 1934 to administer the federal securities laws and is currently organized into five divisions. The Agency is governed by a Commission comprised of up to five presidentially-appointed commissioners, one of which is designated the chairman, who effectively functions as the SEC's chief executive.

26.     Four of the SEC's five divisions implement, apply, and monitor the federal securities laws. These divisions include the following:

   a.      The Division of Corporation Finance, which administers disclosure rules for publicly traded companies and primary and secondary securities markets;

   b.      The Division of Investment Management, which administers the 1940 Acts governing investment companies and investment advisers;

   c.      The Division of Trading and Markets, which creates and administers rules and regulations concerning the primary and secondary securities markets; and

   d.      The Division of Enforcement, which investigates potential violations of the federal securities laws and may pursue civil actions against individuals or entities as directed by the Commission.

27.     The fifth and newest SEC division, created in September 2009, is DERA.

28.     The Division of Economic Risk Analysis ("DERA") was formed "in the wake of" the global financial collapse of 2008 and 2009 ("Financial Collapse").

13492183v1

29.     DERA has three types of offices:

    a.     Administrative offices, including the Office of the Chief Counsel and Office of the Managing Executive ("OME"), which directs DERA's support programs and activities, human resources, financial management, contracting, information-technology, and infrastructure support.

    b.     Offices that directly support other divisions ("Division-Support Offices"), which (with one exception) are overseen by assistant directors, including the Office of Litigation Economics ("OLE"), which supports the Division of Enforcement; the Office of Corporate Finance, which supports the Division of Corporation Finance; the Office of Asset Management and the Office of Financial Intermediaries, which support the Division of Investment Management; and the Office of Markets, which supports the Division of Trading and Markets.

    c.     Offices created to indirectly support the Agency and its other divisions, including the Office of Risk Assessment; the Office of Research and Data Services (formerly Office of Quantitative Research) ("ORDS"), which develops and maintains the so-called Quantitative Research Analytical Data Support ("QRADS") program, purportedly designed to develop and refine high quality financial market data and robust analytical processes; and OSD, where Ms. Earle worked.

30.     The Office of Structured Disclosure ("OSD"), the office in which Ms. Earle worked for over seven years, purports to: (1) lead in the design and implementation of technological processes and tools to support the many structured data needs of the Commission, including the creation, implementation, and maintenance of forms and processes designed to capture structured data from SEC registrants through their filings with the Commission; and (2) manage and support the

13492183v1

technology required for the SEC to accept and for investors to view structured data filings. OSD also maintains business ownership of the Tips, Complaints, and Referrals ("TCR") system, which is a publicly accessible internet portal where whistleblowers and others can report potential securities law violations to the SEC. OSD provides administrative support and project management over system modernization and promotes usage of the TCR system.

## CLAYTON

31.     Walter Joseph Clayton III is an attorney and serves as the presidentially-appointed chairman of the SEC.

32.     As chairman, Clayton appoints the directors of the SEC's divisions and holds ultimate authority on all SEC personnel actions.

## BAUGUESS

33.     Scott Walter Bauguess is an economist and a former deputy director of DERA.

34.     In 2007, Bauguess joined the SEC as a financial economist.

35.     In 2011, Bauguess was promoted to assistant director of DERA's Office of Corporation Finance ("OCF").

36.     By October 3, 2013, Bauguess was promoted to become a new co-deputy director of DERA, to join deputy director Jennifer Marietta-Westberg until Ms. Marietta-Westberg's departure from the SEC in September 2016.

37.     Bauguess served as acting director of DERA two times, first in 2014, and again in 2017.

## WILLIS

38.     Robert Michael Willis is an assistant director in DERA, specifically in DERA's OSD.

39.     Bauguess had known and, as deputy director of DERA, hired Willis from the private sector, specifically from PriceWaterhouse Coopers LLP, to become assistant director of OSD.

40.     Bauguess had waited for about one year to fill the assistant director vacancy in OSD so that Willis could unwind from his private-sector position and join the SEC.

41.     On or about July 13, 2015, Willis joined OSD as an assistant director.

**CORONEL**

42.     Kimberly D. Coronel is the managing executive in DERA's Office of the Managing Executive ("OME"), which directs DERA's business, operational, administrative, and support programs and activities. OME's responsibilities include human resources, financial management, contracting, information technology, and infrastructure support.

43.     On or about January 28, 2013, Coronel became business manager in DERA.  An internal e-mail announcing Coronel's appointment as business manager noted that she had come from the Office of the Chief Operating Officer ("OCOO") where she "managed numerous process improvement efforts, including the newly designed employee exit process, as well as initiating last year's [2012's] annual management assurance process for the agency."

**OTHER RELEVANT PARTIES**

**BECKER**

44.     Chyhe K. Becker is an economist and director of DERA.

**DINGMAN**

45.     Lacey M. Dingman is the former director and chief human capital officer of the SEC's Office of Human Resources ("OHR").

**HUMES**

46.     Richard M. Humes is an attorney and an associate director in the SEC's Office of General Counsel ("OGC"). He oversees the Office of Labor Management ("OLM") in OGC.

13492183v1

**BLAIR**

47.     James V. Blair is an attorney and an assistant director in OLM who reports to Humes.

**ROSSITER**

48. Iris M. Rossiter is a labor-management attorney in OLM who reports to Blair.

### V.     FACTS

### A.     SEC'S SEQUENCE OF DEFECTIVE PERFORMANCE MANAGEMENT SYSTEMS

49.     The SEC has a long history of defective performance management[1] systems perpetuated and, at times, misused by SEC managers to engage in illegal favoritism.

50.     The SEC lacks any formal or systematic mechanism to monitor how SEC managers use the appraisal system with respect to their non-managerial SEC employees.

51.     Within the SEC's performance management system, SEC managers effectively have no formal obligations other than to appraise their employees.

52.     The United States Office of Personnel Management ("OPM"), an independent federal agency that manages the government's civilian workforce, has noted that an effective performance management system provides mechanisms that, among other things, monitor how supervisors use such a system.

---

[1] Performance management is a term that the human resources industry uses to refer to a manager's supervision and management of the performances of the manager's reporting employees.  In theory, a manager seeks to ensure that the manager's organizational unit achieves identified objectives; identifies for and communicates to the reporting employees the specific operations that must be undertaken to promote the organizational unit's specific projects and programs; monitors and communicates with the reporting employees to ensure proper execution of the identified operations; and appraises, periodically, the reporting employees' operations.

13492183v1

53.     Since 2000, the SEC's employee performance appraisal systems have been publicly criticized as incompetent with respect to the SEC's performance of its statutory missions and unfair to SEC employees, including non-managerial SEC employees.

54.     On February 13, 2008, the National Treasury Employees Union ("NTEU" or "Union"), representing over 2,500 non-managerial employees of the SEC, publicly reported that an arbitrator, in the fall of 2007, ruled in favor of the Union's grievance, made on behalf of Chapter 293 (the NTEU's SEC chapter) for the 2003 employee rating period, finding that the SEC "merit Pay Plan" had discriminated illegally against employees based on age and race.

55.     The Union president noted that the SEC did not have a clearly defined set of work expectations and that this problem "is one of the most widespread and serious problems with alternative Pay Plans." The Union president welcomed the SEC's decision to temporarily separate its performance management system from its much-maligned merit Pay Plan until the agency could completely implement a new performance management system.

56.     On February 15, 2008, the SEC's then-executive director was reported to have informed a House subcommittee that the SEC was "putting a fresh face" on its controversial personnel system by implementing a completely new performance management system, as a first step, and providing that employees receiving an "acceptable" performance rating would receive equivalent shares of the funds the SEC had available for merit pay increases.

**B.     GAO REPORTS ON SEC PERSONNEL MANAGEMENT**

57.     By 2009, as a consequence of the SEC's personnel management failures, Congress enacted Section 962 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Section 962"). Section 962 requires the General Accountability Office ("GAO") to investigate and to report to Congress every three years on the SEC's "personnel management" ("GAO

13492183v1

Report"). As of today, the GAO has issued two triennial reports, the first in July 2013 and the second in December 2016.

58.     On or about February 11, 2013, before the issuance of the first GAO Report, the SEC's collective bargaining representative, Chapter 293 of the NTEU, noted the following:

   a.    The FY 2012 performance management results, based on the SEC's then-used "evidence-based performance," revealed a "sharp disparity between how SEC managers rate their own performance versus how they rate the performance of their subordinates" and

   b.    The "SEC non-managerial employees received significantly lower performance evaluations than the SEC managers whose employees had purportedly performed so poorly;" and asked how "is it that so many managers can be so highly rated, and yet the Federal Employee Viewpoint Survey results at the SEC are among the lowest of federal agencies in the nation?"

59.     The first triennial GAO Report, published in July 2013 ("GAO-13-621"), reported that the "SEC's organizational culture is not constructive and would hinder its ability to effectively fulfill its mission." Among problems the GAO identified was the SEC's incompletely or inconsistently implemented personnel management system, including performance management and personnel management assessment.

60.     On the topic of the SEC's performance management system, the GAO noted the following:

   a.    SEC staff expresses many concerns about the system, such as the unclear link between their performance and their ratings.

   b.    SEC has not fully validated the system with its staff.

   c.    SEC does not have mechanisms in place to monitor supervisors' use of the system.

13492183v1

     d.     SEC, by not validating all aspects of the system and establishing mechanisms to hold supervisors accountable for appropriately using it, is "missing opportunities to enhance the credibility and effectiveness of its performance management system."

61.    On the topic of the SEC's personnel management assessment, the GAO noted the following:

     a.     SEC has not implemented an accountability system to monitor and evaluated its personnel management; and

     b.     SEC officials explained that efforts were under way to develop a system, but until such an accountability system is implemented, it will be difficult for SEC to make necessary improvements and help ensure that its personnel management policies and programs align with its mission.

62.    The second triennial GAO Report, published on December 29, 2016 ("GAO-17-65), found that the SEC had failed to address five of the seven recommendations made three and one-half years earlier in GAO-13-621, including the recommendations concerning performance management.

## C.    SEC'S EMPLOYEE REMOVAL METHOD (ERM)

63.    The SEC's employee removal method ("ERM") uses the SEC's most recent version of its so-called performance management system ("PMS"), which is essentially an annual appraisal system of employees, to enable the removal of employees members of management have targeted for termination.

64.    The ERM requires managers to fabricate a pretext to label an employee's performance as "unacceptable" so as to facilitate that employee's subsequent removal from employment.

65.    The fact that the ERM functions equally well for truly low-performing employees whose performance cannot be improved as for employees who have been targeted for inappropriate or

16

illegal reasons, such as discrimination based on gender, age, or race, enables the inappropriate application of the ERM to hide, undetected, among the valid uses.

66. The ERM persists and its misuse remains undetected—until exposed in this Complaint—in large part due to the lack of oversight and monitoring of supervisors' use of the PMS as noted in the numerous GAO Reports cited above.

67.   The ERM avoids correcting the defects of the PMS, despite years of public critiques of the SEC's ever-changing PMS, while relying on the continuing and replicated defects of the latest version of the PMS, including the continuing absence of controls on SEC managers to avoid challenges to the pretextual appraisal of an SEC employee.

68.   The ERM empowers the SEC's Office of General Counsel ("OGC") to threaten an SEC employee with an almost-certain "unacceptable" performance evaluation, adverse employment separation, and career-impairing termination if the SEC employee insists on undertaking a performance improvement plan ("PIP") instead of resigning "voluntarily."

69.   The ERM consists of two key phases.

70.   In the first phase of the ERM, generally and as applied to Ms. Earle, the following acts and omissions occur:

   a.      The targeting SEC manager does not inform the SEC employee of any performance issue during the required review for the mid-year period that ends March 31;

   b.      The targeting SEC manager orally informs the SEC employee that his or her annual performance "resulted" in a rating of "unacceptable" only after the annual rating period that ends at the conclusion of the fiscal year (September 30), thereby making it impossible for the SEC employee to address or correct the purported "unacceptable" performance prior to the end of the fiscal year;

13492183v1

c.       The targeting SEC manager has not prepared a written evaluation, as the PMS ostensibly requires, before informing the SEC employee the "results" of the "evaluation," because in the second phase the ERM will often prompt a coerced "voluntary resignation" that makes any written evaluation superfluous; and

d.       The targeting SEC manager orally informs the SEC employee that the unacceptable rating will require the latter to be placed on a so-called Performance Improvement Plan ("PIP") and that he or she must speak to an attorney in OGC (OGC attorney) about the "unacceptable" performance evaluation.

71.    Failure to prepare a written evaluation enables the SEC to conceal its use of the PMS as a pretext to remove employees, enabling the SEC to point to the departure of successfully extorted employees as "voluntary" resignations.

72.    The OGC attorney assigned to "counsel" the SEC employee about their "unacceptable" performance rating typically does not know the SEC employee, does not know the relationship between the SEC manager and the SEC employee, and does not know or have expertise in the SEC employee's position description[2] or area of work or expertise.

73.    The Office of Human Resources ("OHR"), under the direction of the former director of human resources, Dingman, facilitated the delegation of OHR's role in the PMS to OGC.

74.    Neither OHR, OGC, the OGC attorney, nor any other manager in the SEC questions the genuineness of the SEC manager's claim of the SEC employee's "unacceptable" performance or questions the SEC manager's real reason for assigning the SEC employee an "unacceptable" work performance, orally or in writing.

---

[2] A "position description" is a statement of duties and responsibilities comprising the work assigned to a civilian employee.

75.     In the second phase of the ERM, generally and as applied to Ms. Earle, the following acts and/or omissions occur:

    a.    The OGC attorney assigned to the matter meets with the SEC employee to discuss the "remedial" PIP process, a process that lasts from 30 to 90 days; if no meeting occurs, the OGC attorney can and does communicate this and the following information with the SEC employee, most often a bargaining-unit employee, through one or more representatives of the SEC's labor union, the NTEU, or the SEC employee's attorney;

    b.    The OGC attorney informs the SEC employee that if he or she fails the PIP, the SEC will propose an adverse action (removal) and remove the SEC employee from federal service; the OGC attorney also notes that the work record of the SEC employee, upon termination, will include Standard Form 50 ("SF-50")[3] Notification of Personnel Action, which will indicate the employee was removed from their position;[4]

    c.    An employee's SF-50 contains information about federal government employees, including promotions and awards, periods of employment, and reasons for

---

[3] Some have called the SF-50 the "Federal Employment Birth Certificate" as it contains the employee's social security number, date of birth, date of appointment, position, series, and grade.

[4] OPM identifies the adverse basis for the removal, namely, "unacceptable" work performance. The personnel or administrative office to which appointing authority has been delegated completes the SF-50; it is used to notify the employee and the payroll office, and to record the action in the employee's Official Personnel Folder ("OPF"). OPM or the agency's administrative office informs the SEC employee that an adverse SF-50 documents the reason for separation from governmental service, and if the reason is "unacceptable" performance, then the removal is deemed an "adverse action," which is a personnel action considered unfavorable to an employee, e.g., removal, suspension, furlough, or reduction in grade or pay. 5 U.S.C. chapter 75; 5 CFR part 752. The SEC is required to document the reasons for the adverse action on the SF-50.

departure from federal government employment.  Information in an employee's SF-50 is consulted by federal agencies in making hiring decisions.  For purposes of SF-50, the distinction between "removal" and "resignation," or "retirement" is significant to the SEC employee (or any federal employee):

   i.   "Removal" is a separation personnel action initiated by the SEC (or other federal agency), the Office of Personnel Management, or the Merit Systems Protection Board under 5 CFR parts 359, 432, 731, 752, or comparable agency statutes or regulations to involuntarily terminate and separate a federal employee from employment with the government;

   ii.   "Resignation" is defined as a separation personal action that a federal employee initiates to terminate and separate from the government;

   iii.   "Retirement" is defined as a separation personal action made when a federal employee is eligible to obtain an immediate annuity, and can be voluntary or involuntary (called discontinued service retirement);

d.   The OGC attorney informs the SEC employee that the reasons for the adverse action on the SF-50 are used to determine future employment eligibility and eligibility for various benefits, including unemployment compensation. When a former employee applies for unemployment compensation, the state unemployment agency will use the nature of the action and the remarks to adjudicate the claim. Inadequate or incomplete information about the separation may result in delays or errors in processing such claims;

e.   The OGC attorney informs the SEC employee that, as a result of an adverse action following the employee's failure of the PIP, the SEC employee likely will not find

20

other employment in the federal government or, perhaps, in state government or even in the private sector;

f.      The OGC attorney informs the SEC employee that, as a statistical matter, most employees on PIPs fail, which results in immediate termination and removal and the consequence of an adverse SF-50 that remains in the employee's personnel file forever;

g.      The OGC attorney then offers the SEC employee an opportunity to avoid having an adverse SF-50 by executing a settlement agreement that expunges poor appraisal ratings and provides employment references that do not present a prospective employer with negative information about the employee in exchange for the employee's resignation and relinquishment of appeal rights, leaving the SEC employee with the option of either undertaking the PIP, with almost certain "failure" and removal from the SEC with an impaired employment future, or resigning and retaining the opportunity to obtain future government employment elsewhere.

76.    While the SEC manager initiates a process that is ostensibly designed to promote improved performance, the process is adversarial. The OGC attorney's admission that most SEC employees fail the PIPs acts as a thinly veiled threat that if the SEC employee puts OGC and the SEC manager to the trouble of documenting the employee's departure, then additional negative consequences await. The SEC's internal legal counsel acts as a representative of the SEC, and exclusively in the interests of the SEC manager.

13492183v1

77.     The ERM renders integrity irrelevant as applied to the SEC employee.  The ERM's results mislead potential future employers, by either including false negative information or failing to include true negative information, about a former SEC employee.

78.     The structure and application of the ERM, when it results in the SEC employee's resignation, "benefits" the SEC manager, OGC, and OHR.

79.     The ERM enables any targeting SEC manager to commit the following acts and/or omissions:

   a.     A targeting SEC manager can remove any SEC employee *for any reason*, including a reason unquestionably or likely illegal, while minimizing legal consequences to the SEC manager and the SEC: if the [targeted] SEC employee resigns, he or she relinquishes any claims deriving from such illegality; if the employee does not resign, then the SEC has fully papered the "due process" required in effecting the SEC employee's removal and the outcome is as certain as the SEC manager's determination;

   b.     A targeting SEC manager can avoid the work of managing the SEC employees assigned to the manager's unit, including the work of interacting and communicating with employees, setting objectives and monitoring the operations of employees, and evaluating employees on a periodic basis in a meaningful way;

   c.     A targeting SEC manager can avoid being scrutinized for poor management performance in communicating with, monitoring, directing, and assisting SEC employees;

   d.     A targeting SEC manager can minimize documentation concerning the basis or bases for and process of the SEC employee's removal; if the SEC employee

requests a PIP, the OGC attorney then—belatedly—drafts the SEC employee's work performance appraisal, thereby further reducing the workload for which the SEC manager is well paid; and

e.    A targeting SEC manager can claim that communications between the SEC manager and OGC, including oral communications and documents generated, created while orchestrating the removal of an SEC employee, are confidential and are, therefore, "privileged" and consequently inaccessible to the [targeted] SEC employee; the "reasoning" is that the SEC manager is "more of" an agent of the SEC than is the SEC employee and the OGC, with which the SEC manager communicates and on which the SEC manager relies, is the internal legal counsel to the SEC.

80.    Under the PMS, the SEC employee appraised as having an "unacceptable" or "unsatisfactory" work performance generally has the right to request a remedial PIP, which can last from thirty (30) to ninety (90) days.

81.    In theory, the PIP is designed to enable an SEC employee "to improve" the performance that purportedly resulted in the unacceptable or unsatisfactory rating received in the performance appraisal process. In practice, however, the PIP is as subjective and independent of controls in the SEC as is the performance appraisal process, and, for the targeting SEC manager, is merely a necessary step in the process of removal.

82.    The ERM further enables SEC managers to commit the following acts or omissions:

a.    SEC managers can remove SEC employees who comply (do not demand PIPs) for any reason while creating the appearance of normal attrition based on retirement or voluntary resignation;

    b.      SEC managers can conceal the real operating objective of the ERM in removing an employee the manager has targeted for whatever reason; and

    c.      SEC managers can avoid impairing the SEC's "Best Places to Work" marketing campaign.

83.    From July 21, 2015 through, at least, January 1, 2018, in terms of DERA front office personnel and managers, there has been disparately decreasing number of female employees relative to an increasing number of males. On October 16, 2014, there were nine (9) male employees and nine (9) female employees. On July 21, 2015, there were eleven (11) male employees and nine (9) female employees. On October 2, 2015, there were fourteen (14) male employees and eight (8) female employees. On December 12, 2016, there were seventeen (17) male employees and seven (7) female employees. By January 1, 2018, there were (20) male employees and (6) female employees.

84.    The decreasing number of female DERA front office personnel and managers over multiple years evidences a gender-based employment pattern that disproportionately harms females DERA employees and favors male DERA employees.

85.    In 2016, Bauguess targeted for removal, using the ERM system, the only other Jewish employee in DERA in order to create a slot for a friend.

86.    In the present matter, as detailed below, the Defendants targeted Ms. Earle – a Jewish female over forty, who is an older, more experienced SEC employee and who was (erroneously) believed to be eligible for retirement based on her age – for removal and used the ERM against her to create a vacancy needed to enable Bauguess and Willis to create a new management position without changing DERA's personnel budget requirements.

13492183v1

87.    In an effort to discourage Ms. Earle's subsequent documentation of managerial sub-optimization, ineffectiveness, questionable practices, and the exercise of her applicable legal rights, as detailed below, the Defendants, in retaliation, hastened their predetermined termination of Ms. Earle by violating her rights against illegal discriminatory and retaliatory actions.

**D.    MS. EARLE'S REMOVAL FROM THE SEC USING THE ERM PROCESS**

**1.    PERFORMANCE DURING FY 2016**

88.    In and for FY 2016, Willis, a certified public accountant, nominated Ms. Earle for the DERA Director's Award and DERA awarded Ms. Earle DERA's Director's Award on June 28, 2016, some three months before FY 2017 began on October 1, 2016, "in recognition for outstanding work, extraordinary effort, and tireless dedication in furtherance of the Division's mission."

**2.    THE OSD REALIGNMENT**

**a.    DERA ANNOUNCES OSD's REALIGNMENT (January 26, 2017)**

89.    On January 23, 2017, President Donald Trump signed a Presidential Memorandum ("Memorandum") that announced a ninety-day freeze on government hiring, including the SEC. The Memorandum also anticipated that the Office of Management and Budget ("OMB") would develop a workforce reduction plan for the federal government.

90.    On January 26, 2017, three days after the Memorandum's issuance and almost four months into FY 2017, Bauguess emailed employees of OSD and another DERA office, the Office of Research and Data Services ("ORDS") ("January 26 Email"). (Exhibit 1). The January 26 Email stated:

a.    "Early next week we are going to meet with all of you to discuss the creation of a new DERA office, several new positions, and a realignment of some staff within these offices."

b.     "None of these changes should affect your current job responsibilities.  But all of the changes are intended to increase the support you receive for your mission-critical work, and reflect the increased prominence of your roles in advancing the Commission's mission."

91.     When the January 26 Email was sent, DERA had eight assistant directors (pay grade SK-17), and two associate directors (pay grade SO-1), one in the Office of Litigation Economics ("OLE"), and one overseeing policy in DERA's Division Support Offices.  OSD was headed by one of the assistant directors, Defendant Willis, and contained one other manager, an SK-15 branch chief reporting to Willis. An SK-17 assistant director, who had two SK-15 branch chiefs reporting to him, led ORDS.

b.     **THE OSD REALIGNMENT CHART (February 2, 2017)**

92.     On February 2, 2017, Bauguess and DERA's managing executive, Coronel, met with OSD and ORDS employees and provided them with two schedules.  The schedules illustrated the to-be OSD and ORDS organizations and was entitled "OSD/ORDS Crosswalk" ("Realignment Chart"). (Exhibit 2). The Realignment Chart illustrated that:

a.     Three ORDS employees would be moved to OSD and one OSD employee moved to ORDS;

b.     OSD would be divided into two offices;

c.     One office in OSD, the original OSD, would be renamed Office of Disclosure Technology ("ODT");

d.     A new office in OSD would be named Office of Rulemaking Support ("ORS"), which would be led by a new SK-17 assistant director position;

e.     ODT would be divided into two branches and one of the branches would require a

26

new SK-15 branch chief; and

f.      A new senior officer ("SO") position would be created to oversee the newly-configured OSD ("New SO position").

93.      For the following reasons, the creation of OSD's new Office of Rulemaking Support was unnecessary:

a.      First, the ORS would be redundant, as DERA's Division-Support Offices, each linked to a Mission-Related Division in the SEC, already provided rule-making support for the Mission-Related Divisions.

b.      Second, the ORS would also be unwarranted, given the OSD had no attorneys in the office and would need to hire two attorneys, an SK-13 and an SK-17, to work on "rulemaking support."

c.      Third, the ORS would also be inconsistent with prior SEC mandates, including a memorandum that former Chairman White issued on August 15, 2013, which confirmed a Chairman Schapiro memorandum of March 15, 2012 and provided follow-on "operating procedures" including that, for rulemaking, "DERA point of contact will be the Assistant Director in the DERA policy office responsible for matters from that rule-writing division or office."

**c.      CREATION OF OPEN SLOTS FOR OSD**

94.      The Realignment Chart identified new OSD positions as red and asterisked, and the asterisk at the bottom of the OSD schedule noted, in italics, that the "New positions" would be created from "repurposed DERA vacancies."

13492183v1

95.     The New SO Position would be created as an apparent consequence of the proposed realignment and titled as an associate director (an SO position), thus converting OSD from an assistant-director group, headed by an SK-17, to an associate-director group, headed by an SO-1.

96.     The creation of the New SO Position enabled Willis, whom Bauguess had made OSD's assistant director and Ms. Earle's immediate supervisor on or about July 13, 2015, after having left open the assistant director position for about one year, to be promoted from OSD's assistant director to associate director of the "new" OSD.

97.     Bauguess and Willis created the assistant director position (SK-17) of ORS to promote a younger female attorney acquaintance of theirs into the new slot.

98.     During the February 2, 2017 meeting, neither Bauguess nor Coronel explained why the New SO Position was considered desirable, how the New SO Position would be funded, or how Bauguess and Coronel expected the occupied positions in OSD would be made vacant without one or more OSD employees retiring or resigning from OSD.

### d.     MS. EARLE'S PERFORMANCE DURING FY 2017

99.     On March 20, 2017, over five and one-half months through FY 2017, Willis emailed another SEC employee to have Ms. Earle, the person heading up the IFRS taxonomy team and the only other CPA in OSD besides Willis, and other IFRS taxonomy team members, nominated for two awards related to, among other things, accounting excellence ("March 20 Email"). The March 20 Email sought nominations for Ms. Earle and her colleagues for:

    a.     The Andrew Barr Award, an award that "recognizes an accountant or team who displays the qualities of outstanding accounting ability, analysis, critical judgment and creativity in addressing complex challenges, along with dedication to public service and to the agency"; and

      b.     The International Award, an award that "honors an individual or team who has demonstrated dedication, professional competence and ingenuity in their work to advance international regulatory, supervisory or enforcement cooperation; promoted the sharing of best practices among market regulators; or facilitated the convergence of international regulatory standards."

100.    In the March 20 Email, Willis stated: "Here is the DRAFT language that I submitted – weak as it is:

    IFRS Taxonomy team: (Kim Earle, Anzhela Knyazeva, etc.) working since 2010 to enable the SEC to approve the IFRS taxonomy for use by foreign private issuers reporting to EDGAR using XBRL has enabled approximately 500 foreign private issuers to report tagged data, resulting in a fully representative set of registrants' data to be available to investors. By taking this leadership role, the SEC has strengthened global markets and provided international regulators with a blueprint for implementing standardized reporting.

(Exhibit 3).

101.    In May 2017, during his belated mid-year review of Ms. Earle's performance for FY 2017, Willis made no mention of her performance being any less meritorious than her previous, award-warranting work.

102.    When FY 2017 ended on September 30, 2017, the following facts coexisted:

      a.     Defendants had yet to implement the OSD Realignment;

      b.     Ms. Earle was the only certified or chartered professional in OSD, other than her supervisor, Willis;

      c.     Ms. Earle had the highest non-managerial grade in the SEC, SK-16;

13492183v1

d.      Ms. Earle was the only female SK-16 in OSD, the other three being Caucasian
males;

e.      Ms. Earle was the only Jewish employee remaining in OSD;

f.      Ms. Earle was the only SK-16 in OSD who had not personally known her
immediate supervisor, Willis, before June 2015, at which time Bauguess had
successfully recruited Willis to join the SEC from PriceWaterhouse Coopers LLP
as assistant director of OSD;

g.      Ms. Earle was the only SK-16 who had not worked with previously or participated
in the XBRL industry leadership activities with Willis before Willis joined the SEC
in June 2015; and

h.      On the basis of her age, Coronel and Bauguess erroneously considered Ms. Earle
eligible for early retirement from the SEC.

103.    Defendants Baugess' and Coronel's belief that Ms. Earle was eligible for early retirement
based upon her age was one of the bases for their artifice or scheme to deprive Ms. Earle of her
federal employment—this sentiment discriminated against Ms. Earle based on her age.

104.    Defendants Bauguess' and Willis' other reasons for removing Ms. Earle included that she
was a woman and a member of the Jewish faith.

105.    Defendants decided to weaponize the SEC's employee removal method (ERM) in FY 2018
to create vacant positions in OSD in order to construct the New SO Position for Willis.
Specifically, SEC managers, with the assistance of the Office of Human Resources ("OHR") and
OGC, successfully targeted SEC employees, including Ms. Earle and other DERA employees,
using the ERM.

e.   **COMMENCING THE REALIGNMENT AND TARGETING OF MS. EARLE (November 2017)**

106.   In November 2017, Defendants Coronel, Bauguess, and Willis began to orchestrate the OSD Realignment.

107.   When Willis joined the SEC in mid-2015, Ms. Earle had suggested "proactively" that she and Willis confer on a bi-weekly basis to ensure that Willis was updated on all new developments.

108.   On November 8, 2017, during their regular weekly meeting and about five weeks after FY 2017 had ended, Willis shouted at Ms. Earle that she had performed unacceptably for FY 2017 ("Appraisal Announcement") and that he was going to put her on a PIP.

109.   In an affidavit dated August 18, 2018, Willis characterized the Appraisal Announcement as Ms. Earle's "performance evaluation" under the SEC's Performance Management System ("PMS").

110.   On November 9, 2017, at 6:54 a.m., Willis emailed Ms. Earle and stated, "As discussed, this year's overall evaluation will include and [*sic.*] unacceptable rating.  You should speak with Iris Rossiter (cc'd above) to learn more about the Performance Improvement Plan process." (Exhibit 4).

111.   Willis had not informed Ms. Earle before the meeting that the weekly meeting for November 8, 2017, would include Ms. Earle's Appraisal Announcement for FY 2017.

112.   Willis' Appraisal Announcement was the first time that Willis suggested or stated that Ms. Earle's work performance for FY 2017, which had ended over five weeks earlier on September 30, 2017, had been "unacceptable."

113.   On November 9, 2017, Ms. Earle informed the SEC's collective bargaining representative, Chapter 293 of the NTEU, of Willis' "evaluation," after which Defendants did not formally

communicate with Ms. Earle until February 20, 2018, a period of about two and one-half months and over three and one-half months after FY 2017 had ended.

114.    Defendants did not provide Ms. Earle with any written evaluation as required under the SEC's PMS or offer any suggestions about how she could "improve" her performance until February 20, 2018.

115.    On November 28, 2017, almost three weeks after Willis' Appraisal Announcement, Coronel emailed OSD employees to inform them that a minor realignment would be taking place within OSD involving a few staff. (Exhibit 5). In the email, Coronel noted the following:

    a.    Given the impending Thanksgiving holiday and travel schedules, management planned to meet with the seven impacted staff the following week to discuss the intended changes;

    b.    An OSD meeting would follow "in order for us to have a broader discussion with everyone;" and

    c.    OHR had issued personnel notifications to impacted staff prematurely.

    f.    **WRITTEN CONTACT CONCERNING PERFORMANCE (January 17, 2018)**

116.    From November 1, 2017, to January 17, 2018, Ms. Earle received nothing in writing from DERA, OGC, or OHR or about her purportedly "unacceptable" performance for FY 2017.

117.    On January 17, 2018, over three and one-half months after FY 2017 had ended, an NTEU representative, apparently acting as an agent of OGC, emailed Ms. Earle.  ("January 17 Email"). The initial portion of the January 17 Email, in pertinent part, stated:

As you may know, we have been meeting with DERA Management in an attempt to get them to back away from putting you on a PIP... OGC reports that, if we don't reach a settlement, you are about to be given a PIP that will include the passage set forth below or

13492183v1

words to that effect… OGC has offered to not issue the PIP if you agree to take a voluntary

demotion to Grade 14 . . . and waive any claims you may have against the agency… I

believe that the demotion option might not have been offered if it had not been for [NTEU

Representative's] conversations with Scott Bauguess and Kim Coronel, who previously

thought that you were eligible to retire now without a reduction in benefits, and that you

would have already received the PIP.

(Exhibit 6).

118.    Included below the initial portion of the January 17 Email, appeared an anticipatory

appraisal ("Anticipatory Appraisal"), which was in a different font and contained a list of failings

("List of Failings"):

    a.    The NTEU representative had copied the Anticipatory Appraisal and its List of

          Failings from a prior email from OGC counsel Rossiter to him to be forwarded to

          Ms. Earle;

    b.    The Anticipatory Appraisal began, "You have failed to perform your duties at a

          minimally acceptable level during the 2017 rating period.  Examples of your

          unacceptable performance include:";

    c.    The List of Failings identified Ms. Earle's purported failings as including failing *to*

          *provide*, *to produce*, *to address*, *to communicate*, *to engage*, *to follow-up*, or *to take*

          *personal responsibility*, and used qualifying adverbs *independently*, *proactively*,

          and *timely*.

    d.    The List of Failings included Ms. Earle's "failing to proactively have appropriate

          tools installed on [her] working [Personal Computers] (e.g., Microsoft Project,

          Fujitsu Xwand)." ("Installation Failure").

e.    The Installation Failure illustrates the pretextual nature of OGC's and DERA's identification of Ms. Earle's performance "failures" given that Ms. Earle had requested, during FY 2017, that the SEC's Office of Information Technology ("OIT") install the software identified in the List of Failings, and that OIT failed to respond to her requests (a result that is neither uncommon nor surprising), and Ms. Earle could not herself install this software without violating SEC rules.[5]

f.    The remaining items on the purported List of Failings were either provably and demonstrably false or constituted the transference of blame for work assigned to other personnel from those persons to Ms. Earle.

g.    **DERA'S NON-PARTICIPATION IN JANUARY 17 EMAIL**

119.    In EEO investigative affidavits created during the EEO Complaint process, Willis declared, on August 14, 2018, that he was not involved in or aware of the January 17 Email and knew nothing of a "demotion" option.

120.    On January 18, 2018, Ms. Earle emailed the NTEU and stated that the January 17 Email revealed "ongoing communications of which I was previously unaware, between Chapter 293 of the NTEU and certain managerial employees of the SEC, both in the Division of Economic and Risk Analysis, and the Office of General Counsel. I sincerely appreciate your efforts on my behalf. However, due to the sensitive and personal nature of these matters I kindly ask that you contact me in advance of having any future communications about me." (Exhibit 7).

---

[5] Ms. Earle had no authority to compel OIT to do its job and comply with her requests. Moreover, installing software on SEC systems requires administrative passwords not available to SEC non-OIT employees and an attempt to bypass OIT and perform an installation herself would have caused Ms. Earle to violate the SEC's information technology security protocols.

13492183v1

121.     Despite reaffirming this request to the NTEU in an email dated January 24, 2018, the NTEU representative, apparently still acting as OGC's agent, asked, "What would you like us to say to Iris [Rossiter] about whether you will be proceeding with the PIP or taking the downgrade?" (*See* Exhibit 7).

122.     Ms. Earle's legal counsel thereafter informed Rossiter that Ms. Earle would proceed with the PIP.

### h.     OGC'S PERFORMANCE APPRAISAL (February 20, 2018)

123.     On February 20, 2018, Rossiter of OGC provided Ms. Earle, for the first time, a 2016-2017 Performance Work Plan — a completed, written Performance Appraisal, the PIP, and a Position Description that Ms. Earle had never before received or even seen.

124.     The Performance Appraisal rated Ms. Earle as follows:

     a.     "unacceptable" for the "critical element called "Achieving Results in Occupation;"

     b.     "acceptable" ("Accomplished Practitioner") for the other critical element called "Teamwork and Collaboration"; and

     c.     "unacceptable" for overall performance.

125.     In EEO investigative affidavits created during the EEO Complaint process, Willis declared, on August 14, 2018, that he was not involved in or aware of Ms. Earle's "allegation" that "on February 20, 2018 she received an 'unacceptable' on her fiscal year 2017 performance rating."

126.     Willis admitted that he understood that Bauguess and Coronel were involved in the decisions to issue the Performance Appraisal and PIP to Ms. Earle.

127.     Office of Personnel Management ("OPM") guidance and federal regulations require federal agencies to document unacceptable performance prior to putting a permanent employee on a PIP.

128.   Ms. Earle did not receive any documentation concerning her purported "unacceptable" performance for over five months after the end of FY 2017.

129.   Defendants had not drafted Ms. Earle's Performance Appraisal before November 8, 2017, nor had they finished drafting Ms. Earle's Performance Appraisal before February 1, 2018.

130.   Defendant Willis and OGC attorney Rossiter jointly drafted Ms. Earle's Performance Appraisal.

### i.   PIP PERIOD (February 21, 2018 to May 21, 2018).

131.   The PIP was 90 days in length, beginning on February 21, 2018, and ending on or about May 21, 2018 ("PIP Period").

132.   During the PIP Period, Willis emailed Ms. Earle numerous and hostile comments ("Willis PIP Emails") containing demonstrably false assertions about "mistakes" and "non-compliance" with the PIP requirements and expanding upon the PIP requirements.

133.   The Willis PIP Emails created a false written record that could be used to justify a pre-determined outcome having nothing to do with Ms. Earle's actual performance during the PIP Period.

134.   On April 5, 2018, less than midway through the PIP Period, Willis emailed Ms. Earle informing her that she had "failed the PIP."

135.   Although Ms. Earle had maintained a spreadsheet of the PIP requirements and documented her compliance with each and every PIP element, Willis refused to review her spreadsheet nor did he identify in any respect any errors in her summary of compliance.

### j.   MS. EARLE'S FILING OF A FORMAL EEO COMPLAINT (April 27, 2018)

136.   On April 27, 2018, Ms. Earle filed a formal EEO complaint based on the above conduct; it is a necessary step to satisfy the administrative remedial process.

13492183v1

3.   **PLAINTFF'S WHISTLEBLOWER MEMORANDUM (May 2, 2018)**

137.   On May 2, 2018, Ms. Earle submitted a memorandum to the SEC ("Whistleblower Memorandum"). (Exhibit 8). The Whistleblower Memorandum discussed several issues:

   a.   First and foremost, the flawed and self-serving ways that SEC managers had coopted the performance assessment system to create the ERM to remove employees such as Ms. Earle for impermissible reasons, i.e., discrimination based on gender, age, and religion, and specifically documented discriminatory acts in DERA observed by Ms. Earle;

   b.   Secondly, how the SEC's enablement of, and response to, the Financial Collapse constituted strong evidence that "Wall Street" banks–commercial and investment banks–had thoroughly and deeply "captured" the SEC; and

   c.   Finally, the various strategies that the SEC's former chairs, Mary Schapiro and Mary Jo White, used to prevent and block investigations into the roles and culpability of Wall Street banking executives in causing or contributing to the Financial Collapse.

138.   On or about May 2, 2018, Ms. Earle delivered or had delivered the Whistleblower Memorandum[6] to each of the SEC's Commissioners, the SEC OIG, the GAO, and the Office of Special Counsel ("OSC").

---

[6] The Whistleblower Memorandum noted several contributing factors to the Financial Collapse, including: (1) unregulated sales of securitized pools of low-quality mortgage loans to investors throughout the world without informing underwriters and investors of the actual risks of purchasing these synthetic securities; (2) an overall failure of credit rating agencies to conduct genuine evaluations of these synthetic securities; (3) a contemporaneous housing bubble existed throughout the United States along with unregulated sales and purchases of credit default swaps, essentially financial guarantees sold without an "insurable interest" in the possible event or state of affairs being insured; and (4) the collapse of two Ponzi schemes of which the SEC had been aware, but failed to take action, post-investigative or otherwise, namely the Bernard Madoff Ponzi

13492183v1

139.   In her Whistleblower Memorandum, Ms. Earle noted that SEC managers abort investigations against Wall Street banking executives like John Mack[7] and Bernard Madoff,[8] because these SEC managers do not want Wall Street banking executives to blackball them for having exposed illegal conduct when these SEC managers seek employment in law firms and lobbying firms that represent the banks that these Wall Street banking executives manage.

140.   In her Whistleblower Memorandum, Ms. Earle also noted how SEC Chairman Schapiro misidentified the causes of the Financial Collapse to include primarily the Madoff Ponzi scheme and the absence of a risk-analyzing division (DERA), asserted an Agency-wide mea culpa ("I am guilty") for that Ponzi scheme, and purportedly "corrected" these contributing causes so as to prevent the SEC's Division of Enforcement from investigating and identifying the schemes and individuals who orchestrated such schemes (including Wall Street banking executives) and who brought about the real-estate housing bubble, the enormous financial losses to world-wide investors of Wall Street's "structured products" (SPEs) and the consequential Financial Collapse, a collapse that prompted the Federal Reserve to double, in less than six months, the monetary base (its liabilities) from $924 billion as of the week ending September 10, 2008, to $2,058 billion as of the week ending January 14, 2009.

---

scheme and the Allen Stanford Ponzi scheme.

[7] With respect to Mack, the director and associate director of the SEC Division of Enforcement fired the investigator, Gary Aguirre, who had insisted on taking Mack's testimony for possible insider trading.

[8] With respect to Madoff, the SEC manager truncated the investigation immediately after the SEC investigator had requested the account number at the trust depository at which the securities for Madoff's customers were purportedly held and for which Madoff had provided a bogus number and immediately before the SEC investigator had the opportunity to contact the trust depository to confirm that such an account existed or that any securities were held therein.

13492183v1

141. The Whistleblower Memorandum noted as well how Chairman Schapiro successfully misdirected the public's gaze from the fact that she had prevented the Division of Enforcement from investigating the largest financial fraud in the checkered financial history of the United States, a history replete with periodic financial frauds during the 19th and 20th centuries.[9] Ironically, the Financial Collapse that went uninvestigated by the SEC was the most significant financial disaster since the Great Depression, which triggered the creation of the SEC in its aftermath.

142.    On or about May 7, 2018, the Office of Equal Employment Opportunity accepted Ms. Earle's EEO Complaint (No. 00009-2018).

### 4.    PIP PERIOD ENDS WITHOUT PIP APPRAISAL (May 20, 2018)

143.    At the end of the PIP Period on May 21, 2018, neither Willis nor any other SEC employee provided Ms. Earle with any feedback on her status. Willis directed Ms. Earle to continue the work she had been doing on implementing the US GAAP and IFRS taxonomy plans she had written during the PIP.

144.    From May 21, 2018, until Rossiter removed Ms. Earle from the SEC HQ on July 30, 2018, Willis made no oral or written negative comments on Ms. Earle's work performance, but thanked her and approved all work she submitted to him.

---

[9] As noted in the Whistleblower Memorandum, Schapiro accomplished this misdirection through several different acts and omissions, including: (1) focusing public attention on the SEC's effort to discover future fraud schemes in advance with the establishment of DERA; (2) creating so-called specialty units in the Division of Enforcement, including a structured products unit ("SPU"), that would address public tips, complaints, and reports ("TCRs") from those who invested in SPEs; (3) creating an Office of Market Intelligence ("OMI") to collect TCRs and funnel them to the specialty units, including funneling SPE-related TCRs to the SPU; preventing other SEC investigators from independently investigating SPE-related TCRs that had not been collected by and directed from OMI to the SPU, by further firing and, with minimal changes, rehiring all of the SEC managers in the Division of Enforcement; and reassigning all SEC non-managers in the Division of Enforcement to new SEC managers or SEC managers of their choice, a process that wasted years.

13492183v1

145.    For over two months, from May 27, 2018, to July 30, 2018, Defendants made no oral or written contact with Ms. Earle concerning her performance on the PIP.

## 5.    SUDDEN RESIGNATION OF DIRECTOR OF DERA, JEFFREY HARRIS (May 28, 2018)

146.    On or about May 28, 2018, the day after Ms. Earle completed the PIP on which OHR, OGC, and DERA had placed her, DERA's director, Jeffrey Harris ("Harris"), informed DERA staff that he was resigning from the SEC effective that week.

147.    On or about May 31, 2018 Clayton promoted or approved the promotion of Becker from associate director of DERA's Office of Litigation Economics ("OLE") to Acting Chief Economist and Acting Director of the Division of Economic and Risk Analysis.

## 6.    PIP APPRAISAL AND NOTICE TO REMOVE MS. EARLE FOLLOW EEO AFFIDAVIT

148.    On July 23, 2018, Ms. Earle submitted, as required for her EEO Complaint, her affidavit concerning her EEO claims ("EEO Affidavit").

149.    On July 30, 2018, perhaps ironically on National Whistleblowers' Day, one week after Ms. Earle had filed her EEO affidavit and over two months after the PIP Period had ended, Defendants removed Ms. Earle from the SEC's HQ.

150.    After allowing Ms. Earle to appear for work as usual, Rossiter personally delivered to Ms. Earle the PIP Appraisal, which claimed she had failed her PIP, and delivered to Ms. Earle a Notice of Proposed Removal from the SEC.

151.    Rossiter provided notice to Ms. Earle that she would be on paid administrative leave pending removal and escorted her from the SEC HQ building.

13492183v1

**7.**    **PLAINTFF'S RESPONSE TO NOTICE OF PROPOSED REMOVAL**

152.   On August 24, 2018, Ms. Earle timely submitted to the new, acting director of DERA, Chyhe Becker, a written response to the Notice of Proposed Removal. Among other things, Ms. Earle's written response included her spreadsheet documenting her fulfillment of each and every PIP requirement.

**8.**    **PLAINTFF'S ORAL RESPONSE (August 29, 2018)**

153.   On August 29, 2018, Ms. Earle and her counsel made an oral presentation in response to the SEC's Proposed Notice of Removal ("Oral Response").

154.   Becker and Rossiter appeared on behalf of the SEC. Attorney Larry Stein ("Stein") appeared on behalf of Ms. Earle.

155.   During the Oral Response, Stein noted that having seen hundreds of PIPs, this PIP was "written for failure," because it included "gratuitous requirements" such as a maximum limit of "two failures" as defined by missing arbitrary and very short deadlines, over a ninety-day PIP period, and excluded any affirmative assistance, constructive assistance, or constructive criticism, but was obviously intended to "remind [Ms. Earle] what a terrible job she was doing." Stein also noted that, despite the attempt to craft a PIP that could not be successfully completed, Ms. Earle had, in fact, fulfilled its requirements through the date on which she was determined to have "failed" it and had documented this in a spreadsheet that had been submitted to Becker.

156.   During the Oral Response, Becker asked Ms. Earle no questions and sought no clarifications.

157.   Becker's silence prevented the creation of any "evidence" for Ms. Earle to use against the SEC.

158.   The SEC made Ms. Earle's termination effective on September 18, 2018, Yom Kippur, the holiest day of the year in the Jewish religion.

159.    On or about September 27, 2018, a Notice of completion of EEO investigation concerning

Ms. Earle's EEO Claims was drafted and sent to Ms. Earle.

### 9.    FINAL AGENCY DECISION (February 18, 2019)

160.    On February 18, 2019, the SEC notified Ms. Earle that the SEC's Final Agency Decision

("FAD") concerning her EEO Complaint had been sent by certified mail.

### E.    PLAINTFF'S EXHAUSTION OF "ADMINISTRATIVE REMEDIES"

161.    Ms. Earle exhausted any and all of the SEC's administrative "remedies," including having

filed the EEO Complaint and completing the EEO process, having requested and attended

mediation, and having submitted written and oral responses.

162.    These "remedies" were devoid of SEC interaction, as Ms. Earle was the only one to make

statements.

163.    The Defendants attending these "remedial" steps avoided asking questions or making

substantive comments to avoid creating evidence and making internally inconsistent or

unsupportable statements.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Gender-Based Sexual Discrimination Pursuant to 42 U.S.C. § 1983

164.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as

if fully set forth herein.

165.    Title VII concerns the employer's inappropriate manipulation of the "terms and conditions"

of the employee's contract of employment, even at-will contracts of employment without terms of

definite duration.

166.    "(A)n employer . . . is responsible for (the acts) of its agents and supervisory employees

with respect to sexual harassment regardless of whether the specific acts complained of were

authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence." 29 C.F.R. S 1604.11(c) (1986).

167.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq., and 42 U.S.C. Section 1981A, for relief based upon the unlawful employment practices of the above-named Defendant SEC. Specifically, Ms. Earle complains of the SEC's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender, religion, and age.

168.    During her employment with the SEC, Ms. Earle was a member of a class protected under Title VII against gender-based discrimination by her employer, the SEC, or by its supervisory personnel.

169.    Defendants have historically used the SEC's employee removal method (ERM) to further illicit employments schemes or artifices by targeting for removal SEC employees, including DERA employees.

170.    The decreasing number of female DERA front office personnel and managers over multiple years evidences a gender-based, discriminatory employment pattern that disproportionately harms females DERA employees and favors male DERA employees.

171.    Defendants' gender bias constituted their true motive in using the artifice or scheme represented by the ERM to deprive Ms. Earle of her federal employment.

172.    In order to staff the new management positions for the OSD Realignment as desired, vacant SK-16 positions were needed.

173.    Defendants used the SEC's employee removal method (ERM) to target Ms. Earle for removal to create the vacancy required for the new management position and because she was an older, female, Jewish employee.

174.    Defendants Coronel, Willis, and Bauguess were each substantially involved in the decisions to issue the FY 2017 Appraisal and PIP, as well as the offer to Ms. Earle that she accept a voluntary demotion to Grade 14 if she waived any claims she may have against the agency as suggested by Bauguess and Coronel.

175.    The combination of actions directed at, and only at, Ms. Earle, including the Willis PIP Emails, baseless FY 2017 Appraisal Announcement, aggressive volume and language during meetings, false assertions about "mistakes" and "non-compliance" with the PIP requirements, expanding PIP requirements, and threatened and actual termination of her federal employment constituted and created an unreasonable and hostile work environment for Ms. Earle.

176.    Defendants further denied Ms. Earle equal employment opportunities because of her gender, religion, and age, to wit:

      a.    Ms. Earle's discharge was a mere pretext for unlawful discrimination in that the SEC knew or should have known that Defendants' accusations regarding unacceptable performance were uncreditable, suspect, and uncorroborated;

      b.    Without regard for veracity or impact, the SEC summarily terminated Ms. Earle's employment;

      c.    The alleged failure of the PIP, in fact, was a foregone conclusion in that the PIP was a pretext for Ms. Earle's termination. This fact was known or should have been known to the SEC at the time of Ms. Earle's discharge; and

d.   Defendants' and Becker's silence during the Oral Response evidences that the entire PIP and ERM process was a sham and pretextual, devoid of actual meaning.

177.   At all relevant times, the Defendants knew or should have known that the discriminatory conduct complained of herein had merit as Ms. Earle had consistently satisfied and/or exceeded all the requirements of her position.

178.   As a further result of Defendants above stated actions and omissions, Ms. Earle has been, is being and will be deprived of income in the form of wages and prospective retirement benefits, and other benefits, promotion opportunities and job assignments due to her as an employee, but denied because of her race and/or national origin and in an amount to be proven at trial.

179.   The Defendants' conduct and omissions were a direct and proximate cause of the injuries, damages and harm suffered by Ms. Earle.

180.   Furthermore, Defendants intentionally and/or with reckless indifference, engaged in the above stated discriminatory practices against Ms. Earle, contrary to Ms. Earle's federally protected rights as guaranteed to her under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981.

181.   The intentional and discriminatory conduct of the SEC complained of herein was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages that will serve as an example and deterrent to the SEC and others who would commit similar illegal acts.

182.   As Defendants engaged in discriminatory employment practices with malice or with reckless indifference to Ms. Earle federally protected rights, Ms. Earle is entitled to compensatory damages and any other applicable remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981A.

13492183v1

## SECOND CAUSE OF ACTION
### Age-Based Discrimination Pursuant to Age Discrimination in Employment Act ("ADEA")
### (29 U.S.C. § 621 – 634)

183.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

184.    The practice of targeting older DERA employees for removal and the view that Ms. Earle was eligible for early retirement based upon her age evidence bias against older employees and a discriminatory employment pattern that disproportionally harms older DERA employees and favors younger DERA employees.

185.    Defendants' age bias constituted their true motive in using the artifice or scheme represented by the ERM to deprive Ms. Earle of her federal employment.

186.    The Defendants' conduct as alleged above constitutes discrimination based on age in violation of the ADEA. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretexts to hide the Defendant's discriminatory animus.

## THIRD CAUSE OF ACTION
### Religion-Based Discrimination Pursuant to 42 U.S.C. § 1983

187.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

188.    The practice of targeting Jewish DERA employees for removal evidences a religious animus and discriminatory employment pattern that disproportionally harms Jewish DERA employees and favors non-Jewish DERA employees.

189.    Defendants' religious bias constituted their true motive in using the artifice or scheme represented by the ERM to deprive Ms. Earle of her federal employment.

13492183v1

190.    The Defendants' conduct as alleged above constitutes discrimination based on religion in violation of Title VII. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretexts to hide the Defendant's discriminatory animus.

## FOURTH CAUSE OF ACTION
### Hostile Work Environment Pursuant To 42 U.S.C. § 1983

191.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

192.    Defendants' conduct as alleged above constitutes a hostile and abusive working environment in violation of Title VII. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretexts to hide the Defendants' discriminatory animus.

## FIFTH CAUSE OF ACTION
### Hostile Work Environment Pursuant to Age Discrimination in Employment Act ("ADEA")
### (29 U.S.C. § 621 – 634)

193.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

194.    Defendants denied Ms. Earle equal employment opportunities because of her gender.

195.    The Defendants' intentional termination of Ms. Earle's through use of a pretext, without regard for veracity or impact, and the alleged failure of the predetermined PIP was known or should have been known to the SEC at the time of Ms. Earle's discharge.

196.    At all relevant times, the Defendants knew or should have known that the discriminatory conduct complained of herein had merit as Ms. Earle had consistently satisfied and/or exceeded all the requirements of her position.

197.    Defendants' conduct and omissions were a direct and proximate cause of the injuries, damages and harm suffered by Ms. Earle.

198.    Defendants engaged in the abusive and discriminatory employment practices with hostility or with reckless indifference to Ms. Earle federally protected rights.

199.    Defendants' conduct as alleged above constitutes a hostile and abusive working environment in violation of the ADEA. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretexts to hide the Defendants' discriminatory animus.

## SIXTH CAUSE OF ACTION
## Retaliation Pursuant to Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621 – 634)

200.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

201.    Ms. Earle's work was award winning prior to 2018.

202.    Defendants' conduct as alleged above constitutes retaliation against the Ms. Earle, because she engaged in activities protected by the ADEA, such as drafting and delivering the Whistleblower Memorandum to the Defendants.

203.    After Ms. Earle delivered the Whistleblower Memorandum Defendants terminated Ms. Earle.

204.    The Whistleblower Memorandum was highly critical of the SEC's ability to fulfill its core mission as well as the SEC's employment practices.

205.    It was only after delivering the Whistleblower Memorandum to the Defendants that Ms. Earle was deprived of her federal employment.

206.    The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretexts to hide the Defendants' retaliatory animus.

13492183v1

## SEVENTH CAUSE OF ACTION
### Retaliation Pursuant to the Whistleblower Protection Enhancement Act (5 U.S.C. 2302(b)(8)-(9)

207.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

208.    The Whistleblower Protection Act of 1989 and the Whistleblower Protection Enhancement Act of 2012 provide the right for all covered federal employees to make whistleblower disclosures and ensure that employees are protected from whistleblower retaliation.

209.    Whistleblowing is defined as the disclosure of information that an employee reasonably believes evidences: a violation of any law, rule or regulation; gross mismanagement; gross waste of funds; an abuse of authority; a substantial and specific danger to public health or safety; or censorship related to scientific research or analysis.

210.    Defendants' conduct as alleged above constitutes retaliation against the Plaintiff, because she engaged in activities protected by Whistleblower Protection Act of 1989 and the Whistleblower Protection Enhancement Act of 2012. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

## EIGHTH CAUSE OF ACTION
### FIFTH AMENDMENT
### (42 U.S.C. § 1983: DEPRIVATION OF PROPERTY RIGHT WITHOUT DUE PROCESS)

211.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

212.    In terminating Ms. Earle as described above, the Defendants, acting in their official capacities, deprived Ms. Earle of her federal and state constitutional protections against deprivation of her property rights without due process.

13492183v1

213.    As noted above, d.    Defendants' and Becker's silence during the Oral Response evidences that the entire PIP and ERM process was a sham and pretextual, devoid of actual meaning.

214.    As of the date of filing her Complaint, while Defendants provided pretextual bases for the FY 2017 Appraisal, PIP, and shambolic PIP, they still have not cited any particular conduct or furnished any reason rising to good cause for terminating Ms. Earle's employment.

215.    As a direct and proximate result of Defendants' violation of the Due Process Clause of the Fifth Amendment, Ms. Earle has suffered grievous harm, including the loss of her constitutional rights, entitling her to legal and equitable relief and other damages.

## NINTH CAUSE OF ACTION
## FOURTEENTH AMENDMENT (42 U.S.C. § 1983: DUE PROCESS)

216.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

217.    By reason of the aforementioned FY 2017 Appraisal, PIP, and shambolic PIP, created, adopted, and enforced under color of law, Defendants, acting in their official capacities, have unconstitutionally deprived Ms. Earle of the equal protection of the law guaranteed under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983, in that Defendants have prevented Ms. Earle from receiving due process under the law.

218.    As a direct and proximate result of Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment, Ms. Earle has suffered grievous harm, including the loss of her federal employment, constitutional rights, thus entitling her to legal and equitable relief and other damages.

13492183v1

## TENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

219.    Ms. Earle repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

220.    Defendants' acts of misrepresenting Ms. Earle's work performance, creating a hostile working environment through threats and yelling, placing her on the PIP, capriciously and unfairly ending the PIP, terminating her federal employment, depriving her of her due process rights, were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the bases and/or consequences of such actions.

221.    The acts set forth herein were committed with the knowledge of and intention to cause extreme discomfort and suffering to any and all persons within close proximity extreme emotional distress to the Ms. Earle and/or her family members, or were done with reckless indifference to the likelihood that such behavior would cause such severe emotional distress and with utter disregard for the consequences of such actions.

222.    Defendants' conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiffs severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

223.    As a direct, foreseeable and proximate result of the conduct of Defendants as alleged herein above, plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

224.    Defendants' undertook their actions willfully, wantonly, maliciously and in reckless disregard for Ms. Earle's rights, and as a direct, foreseeable, and proximate result thereof plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, therefore Ms.

13492183v1

Earle seeks punitive damages in an amount sufficient to deter Defendants and others from similar future wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Earle respectfully requests that this Court enter an order providing for the following legal and equitable relief:

A) to declare that Defendants' termination of Ms. Earle's employment with the SEC violates the Fifth and Fourteenth Amendments to the U.S. Constitution, and all other applicable laws;

B) to declare that Defendants discharged Ms. Earle without good cause, in breach and violation of her right to be free of retaliation and discrimination based upon her gender, religion, and age;

C) to order Defendants to reinstate Ms. Earle to the job she previously held, retroactive to the date of Ms. Earle's discharge, or a substantially similar position, without any loss of pay or such seniority and/or benefits as otherwise would have accrued to her;

D) absent any reinstatement of Ms. Earle in her employment, awarding a money judgment against Defendants in the amount of seven million dollars ($7,000,000.00), or such other sum as a jury or fact-finder finds equal to the back and future lost wages and benefits and retirement benefits of Ms. Earle's former position, as would have accrued to her during the remainder of her employment with the SEC and thereafter, had her employment not been terminated, together with interest thereon;

E) to order the SEC to purge any and all negative references regarding Ms. Earle from its records and her employee file;

13492183v1

F) to award Ms. Earle damages for the past, future, and ongoing loss of her constitutional rights as set forth in this Complaint;

G) to award Ms. Earle's attorneys their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

H) to grant such other and further relief as this Court should find just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all triable claims.

Respectfully submitted this 15th day of May 2019.

/s/ *Adriaen M. Morse Jr.*
Adriaen M. Morse Jr. (DC Bar No. 483347)
Arnall Golden Gregory LLP
1775 Pennsylvania Ave, NW, Suite 1000
Washington, DC 20006
(202) 667-4058 (telephone)
(202) 667-4059 (facsimile)
adriaen.morse@agg.com (email)

*Attorneys for Plaintiff*

13492260v1

**Exhibits**

1. January 26, 2017 e-mail from Bauguess to employees of OSD and ORDS
2. Realignment Chart
3. March 20, 2017 e-mail from Willis to Ms. Earle
4. November 9, 2018 e-mail from Willis to Ms. Earle
5. November 28, 2017 e-mail from Coronel to OSD employees
6. January 17, 2018 e-mail from NTEU representative to Ms. Earle.
7. January 18, 2018 e-mail from Ms. Earle to NTEU representative
8. Whistleblower Memorandum

13492183v1