**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KIMBERLY EARLE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-cv-1419 (CKK/GMH)** |
| **PAUL S. ATKINS, Chairman, U.S. Securities and Exchange Commission,[1]** | |
| **Defendant.** | |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In this action, Plaintiff Kimberly Earle alleges that her termination by Defendant, the Chairman of the Securities and Exchange Commission sued in his official capacity ("Defendant," the "SEC," or the "Commission"), constituted retaliation for engaging in protected activity and gender and religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  The parties have filed cross-motions for summary judgment.[2]  For the reasons stated below, Defendant's motion for summary judgment should be granted and Plaintiff's cross-motion for summary judgment should be denied.

---

[1] The current chair of the Securities and Exchange Commission is substituted for the former chair pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The filings most relevant to this Report and Recommendation are: (1) Defendant's motion for summary judgment and its attachments, ECF No. 70 through ECF No. 70-23; (2) Plaintiff's cross-motion for summary judgment and opposition to Defendant's motion for summary judgment, ECF Nos. 71 through 71-1, 72 through 72-4; (3) Defendant's reply, ECF No. 74; and (4) Plaintiff's reply, ECF No. 75.  Page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.    BACKGROUND[3]

Because Plaintiff alleges that her managers implemented a complex scheme to illegally terminate her, this section begins with a brief outline of the parties' theories, which will help the reader understand the recitation of facts to come.  Plaintiff alleges that managers at the SEC's Division of Economic and Risk Analysis ("DERA") planned to reorganize the division and create new manager-level positions, including a new senior officer position.  *See Earle v. Clayton*, No. 19-cv-1419, 2020 WL 95812, at *2 (D.D.C. Jan. 8, 2020), *appeal dismissed sub nom. Earle v. SEC*, No. 20-5013, 2020 WL 4332907 (D.C. Cir. May 1, 2020).  They were to be funded by capturing the salaries of vacant positions in DERA and repurposing them.  *See id.*  Because there were insufficient vacancies in the division to realize the plan, however, managers concocted a scheme to cause personnel to quit or be fired.  *See id.* at *3, *10.  Plaintiff alleges she was targeted

---

[3] The following factual allegations are undisputed (or deemed undisputed) unless otherwise noted. Where a fact from Defendant's statement of undisputed material facts is explicitly noted as undisputed in Plaintiff's response to that statement, the undersigned generally cites the statement of undisputed material facts. In other circumstances, such as when a fact is insufficiently disputed because, for example, the evidence Plaintiff cites does not support her objection, the undersigned generally cites the record evidence supporting the fact rather than deeming the fact undisputed.

  In connection with her cross-motion for summary judgment, Plaintiff also filed a statement of undisputed material facts.  *See* ECF No. 71-1.  Defendant recognizes that Plaintiff "filed her brief as both an opposition and a cross-motion for summary judgment" but, contending that "it is unclear what arguments apply to the cross-motion and what relief [Plaintiff] seeks from this Court," Defendant has "construed the brief as opposing summary judgment only."  ECF No. 74 at 4 n.1.  Apparently relying on that "constru[al]," it has failed to respond to Plaintiff's statement of undisputed material facts.  That is a perilous strategy, as the undersigned could deem Plaintiff's allegedly undisputed facts admitted under Local Civil Rule 7(h)(1) and Judge Kollar-Kotelly's Order of July 29, 2019, establishing procedures for this case.  *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); ECF No. 4 ("The Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such facts are controverted in the statement filed in opposition to the motion." (emphasis omitted)).  However, where it is clear from Defendant's filings that it would have disputed a properly supported fact included in Plaintiff's statement of undisputed material facts if it had bothered to respond, the undersigned will not deem that fact admitted, as long as there is evidence supporting Defendant's position.

  For her part, Plaintiff makes a frivolous argument that, because Defendant did not file an *opposition* to her cross-motion, but merely a *reply* to her opposition, the Court may "treat Defendant's failure . . . as conceding Plaintiff's cross-motion" for summary judgment.  ECF No. 75 at 5.  That ignores longstanding, binding D.C. Circuit precedent that under Rule 56 of the Federal Rules of Civil Procedure, "a motion for summary judgment cannot be deemed 'conceded' for want of opposition."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 508 (D.C. Cir. 2016).  It also ignores that, notwithstanding the label of its brief, Defendant responded to the arguments in Plaintiff's cross-motion.

because she was Jewish, female, and enjoyed the highest non-managerial pay grade in the SEC's SK pay schedule[4] due to her seniority, which she cites as a proxy for her age. *See id.* at *2. To get rid of her, managers used—or misused—the processes of Chapter 43 of the Civil Service Reform Act and its implementing regulations (together, "Chapter 43"), *see* ECF No. 72-1 at 33–34, which "authorize[] agencies to remove employees or reduce them in grade due to 'unacceptable performance,'" *Garrow v. Phillips*, 664 F. Supp. 2, 3 n.1 (D.D.C. 1987) (quoting 5 U.S.C. § 4303(a)), *aff'd sub nom. Garrow v. Gramm*, 856 F.2d 203 (D.C. Cir. 1988); *see also* 5 U.S.C. § 4301 *et seq.*; 5 C.F.R. § 430.101 *et seq.* More specifically, Plaintiff alleges her managers used the processes of Chapter 43 to "conceal the true reasons for [her] removal"—"her gender, age, and religion." ECF No. 72-1 at 34. She also asserts that she was fired as retaliation for filing a formal complaint of discrimination with the SEC's Office of Equal Employment Opportunity ("EEO Office"). *Id.* at 38.

For its part, the SEC mounts a more conventional argument: that Plaintiff's managers reasonably believed that her deficient performance merited termination and that Plaintiff has adduced no evidence that would permit a reasonable inference that reason was pretextual.

### A.    Personnel and Proposed Reorganization

Plaintiff was born in 1963 and joined the SEC as a Staff Accountant in 1990, ECF No. 70-2, ¶ 1; ECF No. 71-1, ¶ 1; ECF No. 72-2 at 1, ¶ 4. In 2012 (when she was about 49 years old) she was hired into DERA as a Staff Accountant in the Office of Structured Disclosure and promoted to the pay grade SK-16, which is the highest grade for non-managerial employees and the second

---

[4] "The SEC uses an 'SK' pay schedule rather than the 'GS' schedule used elsewhere in the federal civil service." *Wilson v. Clayton*, 272 F. Supp. 3d 25, 28 n.2 (D.D.C. 2017). The pay of "senior officers" at the SEC is governed not by the SK schedule, but by the "SO" schedule. Compensation Overview, https://www.sec.gov/careers/compensation-overview [https://perma.cc/49T3-PTDT].

highest grade in the SK pay schedule.  ECF No. 70-2, ¶ 2; ECF No. 71-1, ¶ 2; *see also* Compensation Overview, https://www.sec.gov/careers/compensation-overview [https://perma.cc/49T3-PTDT].  There were three other SK-16s in the Office of Structured Disclosure—Walter Hamscher, Matthew Slavin, and Brian Hankin—all males with less seniority than Plaintiff who worked in the field of information technology.  *See* ECF No. 72-2 at 12, ¶¶ 40–42; *id.* at 127.  In July 2015, the SEC hired Robert Willis as Assistant Director of DERA, who became Plaintiff's first-line supervisor.  ECF No. 70-2, ¶ 4; ECF No. 71-1, ¶ 4.  Her second-line supervisor (and Willis's first-line supervisor) was Scott Bauguess, Deputy Director of DERA.  ECF No. 72-2 at 9, ¶ 32.  Kimberly Coronel was DERA's managing executive.  *Id.* at 18, ¶ 78.  At the time of Plaintiff's termination in September 2018, Chyhe Becker was Acting Director of DERA, having replaced Director Jeffrey Harris upon his resignation in May 2018.  *See* ECF No. 72-3 at 415, 424.

In December 2016, Bauguess proposed the creation of four new positions in DERA and an attendant restructuring of the division to the SEC's Chief Operating Officer.[5]  As to personnel, DERA would "repurpose four vacancies to establish four new positions within the Office of Structured Disclosure," among them an "Associate Director at the Senior Officer level to lead [the] Office of Structured Disclosure" and an Assistant Director to lead a subdivision of that office.  ECF No. 72-3 at 394.  In addition, "three existing personnel from the Office of Research and Data Services"—the sibling office of the Office of Structured Disclosure—would be repurposed to the Office of Structured Disclosure.  *Id.*  Plaintiff "believed" that the senior officer position was intended for Willis.  ECF No. 72-2 at 18, ¶ 77.  As to restructuring, Bauguess proposed to divide

---

[5] For reasons that are unclear, Plaintiff includes no facts about the proposed restructuring in her statement of undisputed material facts, even though that restructuring is key to understanding her theory of the case.  *See* ECF No. 72-4. She outlines facts in her opposition and cross-motion brief, which includes citations to the record evidence.  The facts asserted here are derived not from the assertions in her brief, but only from the evidence in the record.

DERA's Office of Structured Disclosure into "two new constituent offices," ECF No. 72-3 at 399, which came to be known as the Office of Rulemaking Support and the Office of Disclosure Technology, *see* ECF No. 72-2 at 127.

On January 23, 2017, President Trump froze federal civilian hiring in the executive branch. *See* ECF No. 72-2 at 134. Bauguess's proposal to restructure DERA, however, was apparently approved, *see* ECF No. 72-3 at 405 (asserting that the December 2016 proposal was approved) and, in February 2017, Bauguess circulated a new organizational chart showing four new, unfilled positions, among them the Associate Director of the Office of Structured Disclosure and the proposed Assistant Director position. *See* ECF No. 72-2 at 127. The chart also showed Plaintiff detailed to the Office of Rulemaking Support and Willis as an Assistant Director at the head of the Office of Disclosure Technology. *See id.* Plaintiff was officially "realign[ed]" to the Office of Rulemaking Support in March 2017. *See* ECF No. 72-2 at 129.

It appears, however, that the plan to hire new personnel did not come to fruition—or at least not fully. In May 2017, Coronel sought permission to "recruit" a candidate to fill the Associate Director position "on an SEC-only basis." *See* ECF No. 72-3 at 405. During meetings in the Summer of 2017, Plaintiff and other employees were informed that the hiring of the new management positions, including the senior officer position, had been delayed. *See* ECF No. 72-2 at 20, ¶¶ 92–94. As of December 2017, the Associate Director and Assistant Director positions were still vacant. *See id.* at 19, ¶ 83; *id.* at 132. From a chart apparently created in July 2018, it appears

that hiring for new positions was put off until, at the earliest, fiscal year 2019.  *See* ECF No. 72-3 at 2, 428.

> **B.      Plaintiff's Duties, Performance Issues, and Initial Contact with the Office of Equal Employment Opportunity**

As noted, Plaintiff's work at DERA began in 2012.  Her duties included, among other things,

> [o]verseeing updates to and providing technical review of the U.S. Generally Accepted Accounting Principles ("GAAP") Taxonomy and related artifacts (e.g., implementation and technical guides, release notes, taxonomy references, and other related artifacts); [and]
>
> [m]anaging the adoption, maintenance and providing technical review of the International Financial Reporting Standards ("IFRS") Taxonomy and related artifacts[] (e.g. IFRS Taxonomy Implementation Plan, IFRS Frequently Asked Questions ("FAQs"), implementation guidance on sec.gov, Real Simple Syndication ("RSS") Feed for IFRS reports, sample IFRS Inline Extensible Business Reporting Language ("XBRL") financial statement report and others.[6]

ECF No. 70-2, ¶ 3; ECF No. 71-1, ¶ 3; *see also* ECF No. 70-11 at 3 (identifying Plaintiff as the "lead accountant at the SEC managing the US GAAP taxonomy update processes" and the "lead accountant for the ongoing assessment of the IFRS Taxonomy for inclusion in the Commission's interactive data program").  Working to obtain the SEC's acceptance of the IRFS taxonomy was a

---

[6] According to Plaintiff, by the 1990s, most SEC filings were made electronically through the agency's "EDGAR" reporting system, which "publishes filings online as Web pages." ECF No. 72-2 at 5, ¶ 22(1)–(2). Many such filings require financial statements. *Id.* at 6, ¶ 22(9). The word "taxonomy" in this context refers to "the set of tags . . . in which financial statement elements . . . can be inserted." *Id.* at 7, ¶ 22(17). "Tags" are "pairs of bracketed code that precede and follow . . . to-be-displayed content and that instruct the computer where and how to present the content on the Web browser." *Id.* at 5, ¶ 22(3). Thus, the taxonomies "are used to enable SEC filers to use 'structured disclosure' SEC forms that allow users to extract, transfer, and use the data put into the forms, which the tags reconvert into information." *Id.* at 6, ¶ 22(13). "GAAP and IFRS each requires its own separate 'taxonomy.'" *Id.* at 6, ¶ 22(12).

6

multi-year project involving personnel in DERA as well as other divisions and offices within the agency. *See* ECF No. 72–2, ¶¶ 23–29.

For the 2016 fiscal year, which ran from October 1, 2015, to September 30, 2016,[7] Plaintiff's performance rating was "acceptable." ECF No. 70–7 at 1. She was evaluated on five "Objectives" (such as "[e]fficiently prioritizes, plans, organizes, and schedules assignments to accomplish . . . objectives" and "[a]nticipates obstacles and effectively adjusts plans and schedules to overcome issues," "[e]ffectively identifies and appropriately involves the right people in work activities" and "[p]rovides timely communication necessary to complete tasks and keeps others apprised of changing conditions," "[i]dentifies, establishes or fosters relationships across the Commission and with relevant external parties," and the like) and two "Standards" (critical thinking and teamwork). ECF No. 70-7 at 1–5. On a five-tier rating scale (from "Unacceptable" to "Greatly Exceeds Expectations"), it appears that Plaintiff was rated as "Meets Expectations"—the rating right in the middle—in all categories, *id.*, although Willis commented that she required more supervision and intervention than her peers to manage disparate projects, that she did "not always fully identify necessary activities" and should be "more proactive in her identification and management of project tasks," and that "[o]pportunties exist[ed] for more proactive engagement of resources," ECF No. 70-11 at 8–9, 11.[8] During that fiscal year, Plaintiff had also received a DERA

---

[7] During the relevant period, the SEC's fiscal years ran from October 1 to September 30. *See* ECF No. 72-2, ¶ 9; *see also, e.g.*, ECF No. 70-7 at 1, 7. Thus, fiscal year 2016 began on October 1, 2015, not long after Willis was hired.

[8] Two versions of the evaluation are included in the record: one, at ECF No. 70-7, is signed by Willis and Plaintiff and reflects her ratings on the five-tier rating scale but does not contain all of Willis's commentary. The other, at ECF No. 70-11, is not signed and does not reflect the ratings, but does contain all of Willis's commentary.

Director's Award, which recognizes "outstanding work, extraordinary effort, and tireless dedication in furtherance of the Division[']s mission."  ECF No. 72-2 at 49.

According to a report by the SEC's Office of the Inspector General, in fiscal year 2017, the SEC "began implementing [a] new performance management system and processes, which significantly changed the agency's performance rating structure."  Office of the Inspector General, *The SEC Made Progress But Work Remains to Address Human Capital Management Challenges* at 14 (Sep. 11, 2018), https://www.sec.gov/files/SEC-Made-Progress-But-Work-Remains-To-Address-Human-Cap-Mgmt-Challenges.pdf [https://perma.cc/3HN9-3K4M].[9]  The new system prescribed two "standard competency-based critical elements" for non-supervisors—"Achieving Results in Occupation" and "Teamwork and Collaboration"—and a four-tier rating system ranging from "Unacceptable" to "Performance Leader."  ECF No. 70-9 at 3–4.  Under that program, bargaining unit employees (like Plaintiff) would be rated using the four-tier scale on all performance elements, but receive a final rating of either "[a]cceptable" or "[u]nacceptable."  *See id.* at 13, 22.  A rating of unacceptable on either of the critical elements resulted in a final rating of unacceptable.  *See id.*  Accordingly, in December 2016—to merge the two chronologies, around the time that Bauguess submitted his proposal to restructure DERA and create new positions—Willis emailed Plaintiff and the other SK-16 personnel an SEC form titled "Performance Work Plan" for the 2017 fiscal year, which implemented the new performance management system.  *See* ECF No. 70-8; ECF No. 70-10.  In the first section of the form—"Discussion of Expectations," which were to be addressed at the beginning of the performance period—Willis asked each employee to fill in their high-level goals.  *See* ECF No. 70-8 at 1; ECF No. 70-10 at 1.    There were three additional sections:

---

[9] The undersigned takes judicial notice of this government report.  *See, e.g.*, *Hadwan v. U.S. Dept' of State*, 139 F.4th 209, 219 (2d Cir. 2025) (taking judicial notice of a report by the Department of State's Office of the Inspector General); *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 85 (D.C. Cir. 2024) (taking judicial notice of a report by the Department of Justice's Office of the Inspector General).

8

"Quarterly Performance Check-in Summary," with optional check-ins in the first and third quarters and a mandatory second quarter check-in; "Summary Rating"; and "Performance Elements," which listed the two newly implemented critical elements.[10]  *Id.*  The form also reflected the new four-tier rating system.  *See* ECF No. 70-8 at 3–5.  Presumably because it was issued near the beginning of the fiscal year, the form does not include Willis' ratings or comments.  *See* ECF No. 70-8.

The parties dispute the extent to which Willis discussed Plaintiff's allegedly unacceptable performance with her during fiscal year 2017.  *See* ECF No. 70-2, ¶¶ 15–19; ECF No. 71-1, ¶¶ 15–19.  For example, Plaintiff asserts that in the "routine meetings" she had with Willis, he "never expressed any dissatisfaction" with her work on the IFRS taxonomy acceptance project.  ECF No. 70-23 at 76.  And it is undisputed that in March 2017, the Commission, having accepted the IFRS taxonomy, made it available for use by SEC filers and Willis nominated the IFRS team, of which Plaintiff was a member, for two performance-based awards.  *See* ECF No. 72-2 at 51–56; IFRS Taxonomy for Foreign Private Issuers That Prepare Their Financial Statements in Accordance with International Financial Reporting Standards as Issued by the International Accounting Standards Board, https://www.sec.gov/files/rules/other/2017/33-10320.pdf [https://perma.cc/Q8P7-U7NV]. In May 2017—after the restructuring of DERA had been implemented but the new positions were

---

[10] Plaintiff contends that the form "is not a Performance Work Plan as defined under Chapter 43," ECF No. 71-1, ¶ 6, because, among other things, the "'critical elements' listed on the blank PWP form did not identify any particular job responsibilities or assignments" for the fiscal year and "are generic and not tailored to any particular job or employee." ECF No. 72-4, ¶¶ 13, 15.  As evidence that the "critical elements" violate the regulations promulgated under Chapter 43, she cites her proposed expert's report.  *See id.*, ¶ 15 (citing ECF No. 66-1).  However, in an opinion issued contemporaneously with this one, the undersigned has found that the expert's opinions as to whether the SEC violated applicable regulations are inadmissible.  *See, e.g.*, ECF No. 78 at 16–19 (Memorandum Opinion and Order, Section III.C.1).  More, the expert report *does not state* that either the performance work plan or the identified "critical elements" fail to comply with the regulations.  (For what it's worth, the regulations describe a "[p]erformance plan" as "all of the written, or otherwise recorded, performance elements that set forth expected performance," which "must include all critical and non-critical elements and their performance standards."  5 C.F.R. § 403.203.)

vacant—Willis emailed Plaintiff a copy of the Performance Work Plan for her mid-year review. *See* ECF No. 70-2, ¶ 13; ECF No. 71-1, ¶ 13. The "Quarterly Performance Check-in Summary" section notes the "range of projects" Plaintiff was responsible for, including the "multi-year IFRS taxonomy acceptance project" and the "annual US GAAP taxonomy update" and asserted that they were "working to scale her responsibilities to improve the balance of her project efforts and improve overall effectiveness." ECF No. 70-12 at 2. The documents show, too, that at Plaintiff's mid-year review, Willis planned to discuss issues such as workload balance, taxonomy management, and improving collaboration. ECF No. 70-14 at 8; ECF No. 71-1, ¶ 16. Plaintiff asserts that soon after that review, Willis made her a *de facto* manager of the IFRS taxonomy project, *see* ECF No. 72-2 at 20, ¶ 96, although Willis testified at his deposition that Plaintiff was not responsible for managing the team but, rather, only for "develop[ing] the project plan so that [the team] had an idea of who needed to do what by when," ECF No. 70-13 at 31. In June 2017, Willis communicated his displeasure with Plaintiff's performance. In an email to Plaintiff on the morning of June 17, 2017, Willis stated that he was "disappointed as to the status of the [IFRS taxonomy] plan and [the] lack of communication and outreach to others relevant to the effort." ECF No. 72-2 at 138. He expressed that it was "not clear" to him why Plaintiff had "not made progress on the planning for this critical initiative." *Id.* at 139. That email included a list of tasks for Plaintiff to complete by the end of the next work week, including "a single Microsoft project plan for the IFRS Taxonomy with all relevant tasks and steps listed." *Id.* at 138. He followed up later that morning with an email emphasizing that she must take "ownership" of the project, "proactively pursu[e] solutions" and anticipate tasks, and communicate effectively with other team members. *Id.* at 137.

10

On June 26, 2017, Willis sent Plaintiff an email to "follow up on [their] prior discussion on the status of the IFRS Taxonomy plan" complaining that, during the prior week

> there was a primary task to complete and that was the completion of a single Microsoft project plan for the IFRS Taxonomy with all relevant tasks and steps listed. This step was not completed. It is not clear to me why that was the case as it was the primary task for this effort.

ECF No. 70-15 at 6. That same email noted that Plaintiff had not offered other relevant parties "an opportunity to provide input on an initial completed plan draft" and thus had failed to complete "an obvious step for consideration to ensure completeness and accuracy." *Id.* Willis urged her to focus on completing those tasks and proposed to reassign other tasks or defer them until later. *See id.* Plaintiff also does not deny that, for example, she repeatedly "failed to provide updates on her responsibilities" to a weekly report—although she asserts that Willis did not address that failure in her mid-year review. ECF No. 70-2, ¶ 18; ECF No. 71-1, ¶ 18.

On November 8, 2017, by which time it appears that the plans to fill the new positions were, if not defunct, then at least scaled back, *see* ECF No. 72-3 at 411, Willis met with Plaintiff and told her that her rating for fiscal year 2017 would be unacceptable, *see* ECF No. 70-23 at 107–09.

Plaintiff contacted her union, which thereafter contacted DERA management to discuss Plaintiff's situation. ECF No. 72-2 at 24, ¶¶ 112–113. In an email on January 17, 2018, Daniel Berry, a representative from the union, reported to Plaintiff that attempts by the union to convince managers not to place Plaintiff on a performance improvement plan ("PIP") after her expected unacceptable rating had failed but that, if Plaintiff agreed to be demoted to the SK-14 pay grade, no PIP would be imposed. *See* ECF No. 72-2 at 142. The email also asserted that, in a conversation a different union representative had with Bauguess and Coronel apparently reported to Berry, the two DERA managers had expressed their belief that Plaintiff was "eligible to retire without a

11

reduction in benefits"[11] but, after learning that she was not, offered the demotion option; the email also previewed the content of Plaintiff's expected performance rating, which the union had apparently also learned from discussions with SEC personnel. *See id.* at 142–43.

Plaintiff hired an attorney and, on January 23, 2018, contacted the SEC's Office of Equal Employment Opportunity to request counseling. *See id.* at 26, ¶ 131. On January 31, 2018, she had a meeting with then-DERA director Jeff Harris about her employment issues. *See id.* Plaintiff asserts that her former attorney told her that he thereafter received a call from Iris Rossiter, an Attorney Advisor in the SEC's Office of the General Counsel, who stated that "the likely outcome of the PIP will be removal."[12] *Id.* at 26, ¶ 132. Plaintiff did not agree to demotion. *See id.* at 26, ¶ 133.

### C.    Plaintiff's Unacceptable Rating, PIP, and Formal EEO Complaint

On February 20, 2018, Plaintiff received her unacceptable rating for the 2017 fiscal year. *See* ECF No. 70-2, ¶ 20; ECF No. 71-1, ¶ 20. Willis' review noted, among other things, that Plaintiff "struggled to produce a comprehensive, proactive project plan for the IFRS taxonomy and related activities," resulting in a four-month delay publishing the taxonomy; provided a "disappoint[ing]," ineffective response to a "market participant" who had made an inquiry about the taxonomy; required Willis to make repetitive requests about the status of her projects and failed to deliver timely contributions even though he had reassigned several projects from her portfolio to

---

[11] Plaintiff recognizes that this statement is hearsay. *See* ECF No. 71-1, ¶ 56. Unless "capable of being converted into admissible evidence," hearsay "counts for nothing" on summary judgment. *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Plaintiff has not established that the out-of-court statement of the representative from the union to her, which apparently relies on an out-of-court statement made to him, can be converted into admissible evidence. *See, e.g., Kilby-Robb v. McMahon*, No. 20-cv-992, 2026 WL 886996, at *6 ("Kilby-Robb's only evidence for this remark is to her own declaration, which states what another employee told her about what Anderson said to him. This statement, embedded in hearsay, cannot be relied on to generate a genuine dispute of fact to survive summary judgment." (internal citation omitted)).

[12] This statement, too, is "embedded in hearsay." *Kilby-Robb*, 2026 WL 886996, at *6.

other personnel; and produced "project deliverables that required significant and repetitive versioning reviews by her direct supervisor and/or other DERA staff." ECF No. 70-2, ¶ 21; ECF No. 71-1, ¶ 21. He concluded that Plaintiff's performance "lacked the proactive planning and comprehension expected of an SK-16 and thereby adversely impacted the timely, accurate and complete delivery of the assigned projects," stating that her "inability to take responsibility for the assigned projects, related work actions, and completion tasks, is the primary reason for the unacceptable rating." *Id.*

That same day, Willis placed Plaintiff on a 90-day PIP, noting that Plaintiff had been rated "unacceptable for the Critical Element 'Achieving Results in Occupation.'" ECF No. 70-4 at 1 (footnote omitted). The PIP explained that, by the end of the 90-day period, Plaintiff must "achieve at least the minimally acceptable level (also referred to as the 'Improvement Needed' level)" in that critical element. *Id.* It also listed examples of Plaintiff's unacceptable performance, which largely track those outlined in her performance review. *See id.* at 3–4. The PIP listed twelve tasks, some with constituent parts, for her to complete. These included, among other things,

- "Manag[ing] the adoption, maintenance and provid[ing] technical review" of the IFRS "Taxonomy and related artifacts" by, for example, drafting a sample IFRS financial statement prior to February 27, 2018; drafting and publishing updates to the IFRS FAQ page prior to March 31, 2018; and writing a summary of "lessons learned during the IFRS Taxonomy update process" within 30 days of the update's publication to be used to "improve prospective updates. *Id.* at 5–6;

- "Draft[ing] and post[ing] timely public communications on proposed changes and changes" to the IFRS and GAAP taxonomies by, for example, publishing a "[n]ews release on updates to the IFRS FAQs prior to March 31, 2018." *Id.* at 8; and

- "Demonstrat[ing] an expert knowledge of the applicable Rules and Regulations, . . . identify[ing] and address[ing] all relevant facts and circumstances" in the

13

written work product required by the PIP, and producing "substantially acceptable" written work that did not require significant substantive editing. *Id.* at 9.

The PIP also instructed that Plaintiff could "have no more than 2 instances where [she] fail[ed] to timely complete the assigned tasks" and "no more than 2 instances where [she] fail[ed] to keep management apprised of any delays or new information impacting the completion of project objectives or high priority tasks." *Id.* at 4. In one of his few admissible opinions, Plaintiff's expert maintains that the PIP was unusually onerous because of the number of tasks, the standards of absolute or near-absolute perfection, and the consequent difficulty in demonstrating satisfactory performance under the plan. *See* ECF No. 66-1 at 21–22; *see also* ECF No. 78 at 28 (Memorandum Opinion & Order, Section III.C.2**)**. Plaintiff also asserts that several of the enumerated tasks had previously been assigned to other DERA personnel, such as Hamscher. *See* ECF No. 72-2 at 30, ¶¶ 162–67.

During the pendency of the PIP, Willis and Coronel met weekly with Plaintiff. *See* ECF No. 70-2, ¶¶ 26, 28; ECF No. 71-1, ¶¶ 26, 28. In those meetings, Willis discussed Plaintiff's performance, answered her questions, provided feedback and guidance, and adjusted anticipated completion dates when new facts and circumstances arose. *See* ECF No. 70-2, ¶ 27; ECF No. 71-1, ¶ 27. The PIP ended on approximately May 20, 2018. ECF No. 72-2 at 31, ¶ 170.

On April 27, 2018, while still on her PIP, Plaintiff filed a formal complaint with the SEC's EEO Office. *See* ECF No. 72-2 at 31, ¶ 168; *see also id.* at 151–52 (formal complaint). The office of Jeffery Harris, then the director of DERA, was informed of Plaintiff's formal complaint on May 9, 2018. *See* ECF No. 72-3 at 413. Harris resigned as director at the end of May 2018, to be

replaced by Becker as acting director. *See id.* at 415, 424. An agenda for a briefing of Becker to be held on June 1, 2018, lists Plaintiff's "PIP status" as an item. *Id.* at 420, 426.

Meanwhile, on May 2, 2018, Plaintiff delivered to the Commissioners of the SEC a report "pursuant to the Whistleblower Protection Act of 1989 and No FEAR Act of 2002" alleging a "practice of extortion" by the SEC's Office of Human Resources "acting on behalf of managers throughout the SEC" and the agency's Office of the General Counsel to target certain employees for termination based on "age, sex, race, religion, ethnicity, or even personal dislike," using "'performance . . . as the pretext." ECF No. 72-2 at 187–89 & n.2. The report also alleged "instances and patterns of retaliation, harassment and discrimination by managers in [DERA]." *Id.* at 188. On July 23, 2018, Plaintiff filed an affidavit in support of her formal EEO complaint that included the May 2, 2018, whistleblower report as an exhibit. *See id.* at 32, ¶ 175.

### D.    Plaintiff's Proposed Removal, Response, and Removal

On July 30, 2018, Willis provided Plaintiff a memo proposing her removal because her "performance in the critical element of Achieving Results in Occupation remained unacceptable" during the PIP. ECF No. 70-19 at 1–2. The memo detailed Plaintiff's failures on five tasks in the PIP. First, Willis found that Plaintiff had failed to timely draft an acceptable sample IFRS financial statement, noting that Plaintiff had "submitted multiple versions of th[e] report that included [a] broad range of new and recurring reconciliation errors and omissions" and that the final version was delivered "five weeks past the [PIP] due date." *Id.* at 9. Second, he found unacceptable Plaintiff's work updating the IFRS FAQs page because the responses she provided "were incomplete, relied on source documents that were outdated and inappropriate, and did not include basic key references for the end user"; her draft included "missing links"; and she failed to address one of the Frequently Asked Questions aimed at "direct[ing] the public on how to most effectively

15

obtain an answer from the proper Commission Staff" about technical issues related to the IFRS taxonomy." *Id.* at 9.  Third, he found deficient Plaintiff's written summary of lessons learned during the IRFS taxonomy update process, noting the incompleteness of some of her analyses and other failures to "provide adequate information or insights on a potential lesson learned," ultimately concluding that Plaintiff's work did not demonstrate the advanced communication skills expected of an employee at the SK-16 pay grade. *Id.* at 10–13.  Fourth, he found that Plaintiff did not meet the deadline to publish a news release on updated to the IRFS FAQs, which was to be completed "prior to March 31, 2018"; instead, she made a "unilateral decision to send the required email on Monday[] April 2, 2018," without communicating with him. *Id.* at 15.  Fifth, and finally, he found that the failures identified did not meet the requirement that she demonstrate expert knowledge consistent with her grade and produce "substantially acceptable written work products." *Id.*  Accordingly, Willis proposed Plaintiff's removal.  *See id.* at 16.  The memo identified the deciding official as Acting Director Becker.  *See id.*

On August 24, 2018, Plaintiff responded to the removal proposal in a letter to Becker asserting that her managers were discriminating against her "using the SEC performance management system," that the notice of proposed removal was retaliation for her EEO claim, that her PIP did not meet the requirements of Chapter 43 and its implementing regulations and "was designed to ensure [her] failure," and that the "assertions about [her] unacceptable performance for 2017 do not pass muster."  ECF No. 72-2 at 265–72.  Contemporaneously with Plaintiff's letter, her then-attorney provided a response contending that Plaintiff was not given "a fair opportunity to improve her allegedly unsatisfactory performance following imposition of an unjustified performance improvement plan"; outlining procedural deficiencies in the implementation of the PIP; arguing that the PIP and proposed removal were discriminatory, as evidenced by unidentified "performance

16

failures" on the part of male SK-16s Hamscher and Hankin that "did not lead to their being placed on performance improvement plans"; and claiming that her fiscal year 2017 final appraisal, PIP, and proposed removal were retaliation for her EEO complaint. *Id.* at 279–84. Plaintiff and her attorney also provided an oral response at a hearing on August 29, 2018. *See id.* at 286–90.

On September 18, 2018, Becker upheld Plaintiff's proposed removal, finding unpersuasive Plaintiff's challenge to the errors Willis identified and to the "magnitude of the tasks assigned," as well as her claims of "EEO discrimination" and concluding that her "well-documented" performance failures showed that she had failed to achieve the "Needs Improvement" level in the critical element "Achieving Results in Occupation." ECF No. 70-22 at 1–2.

### E.    Federal Court Proceedings

Plaintiff filed this case on May 15, 2019, and filed an amended complaint on September 20, 2019. *See* ECF No. 1; ECF No. 17. The amended complaint alleged eight causes of action "against a myriad of SEC employees in their official and personal capacities": a claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); a claim under RICO, 18 U.S.C. § 1962(c); five claims under Title VII alleging a hostile work environment, gender discrimination, religious discrimination, retaliation for engaging in protected activity, and retaliation for filing a whistleblower complaint; and a claim for age discrimination under the ADEA. *See Earle*, 2020 WL 95812, at *1. Ruling on the government's motion to dismiss, Judge Kollar-Kotelly found the Chairman of the SEC in his official capacity was "the only proper defendant." *Id.* at *13. She allowed the religious and gender discrimination claims under Title VII and the age discrimination claim under the ADEA to proceed with respect to Plaintiff's termination only and not her unacceptable performance rating or placement on a PIP.[13] *See id.* at *11–12. She

---

[13] Judge Kollar-Kotelly gave two reasons for that decision. First, she found that Plaintiff "allege[d] discrimination claims only as to her termination, with the unacceptable performance rating and the PIP allegations providing context."

further dismissed Plaintiff's Title VII retaliation claim to the extent that it was based on the unacceptable employment rating or placement on the PIP because both of those actions "occurred prior to Plaintiff's protected activity." *Id.* at *12. Judge Kollar-Kotelly noted, however, that "allegations concerning [Plaintiff's] unacceptable performance rating and her placement on a PIP may be considered as background and context" for both the discrimination claims and the retaliation claim.[14] *Id.* at *12–13. All other claims were dismissed. *See id.* at *13.

## II.    LEGAL STANDARDS

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

*Id.* at *11. Second, she found that the unacceptable performance rating and PIP did not constitute adverse employment action sufficient to sustain an intentional discrimination claim. *See id.* at *12.

    About two years after Judge Kollar-Kotelly issued her opinion in this case, the D.C. Circuit decided *Chambers v. District of Columbia*, which overruled prior precedent holding that an adverse employment action cannot sustain an intentional discrimination claim unless it caused "objectively tangible harm." 35 F.4th 870, 874–75 (D.C. Cir. 2022) (en banc) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). In 2024, in a decision "largely consistent" with *Chambers*, the Supreme Court "explained that a plaintiff must simply allege 'some harm respecting an identifiable term or condition of employment' to support a disparate treatment claim." *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 17 (D.D.C. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)). Those two cases changed the legal landscape (at least in this Circuit) as to what constitutes an actionable adverse employment action. Plaintiff did not seek reconsideration of Judge Kollar-Kotelly's decision based on those decisions and claims based on her negative performance review and placement on a PIP have not otherwise been revived. Although Plaintiff appealed Judge Kollar-Kotelly's order on Defendant's motion to dismiss, the appeal was dismissed for lack of jurisdiction. *See Earle v. SEC*, No. 20-5013, 2020 WL 4332907 (D.C. Cir. May 1, 2020). Accordingly, termination is the only employment action at issue here. However, as discussed in Section III.B.1, *infra*, the undersigned addresses Plaintiff's fiscal year 2017 performance review and placement on the PIP and Willis' proposal to remove her in analyzing her claims under a cat's paw theory of liability.

[14] Neither of Plaintiff's retaliation claims in the amended complaint cites the ADEA; they cite only Title VII and the "Whistleblower Protection Enhancement Act." *See* ECF No. 17 at 47–48. However, Defendant's opening brief indicates that an ADEA retaliation claim is at issue, *see* ECF No. 70-1 at 12 ("Both Title VII and the ADEA prohibit retaliation against employees who complain of employment discrimination."), so the undersigned will assume that such a claim is properly before the Court.

Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)). In short, "[s]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."

*Nasser v. District of Columbia*, 962 F. Supp. 2d 234, 242 (D.D.C. 2013) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). A court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Barnett*, 715 F.3d at 358. Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence, and a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Nurriddin*, 40 F. Supp. 3d at 115.

## B.   Disparate Treatment and Retaliation

The federal sector provision of Title VII provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-16(a). Similarly, the ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). The government is also prohibited from retaliating against an employee or applicant for engaging in protected activities such as filing an

EEO complaint alleging employment discrimination. *See Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006); *see also Nguyen v. Mabus*, 895 F. Supp 2d 158, 183 (D.D.C. 2012) ("The same ban on retaliation applies under the ADEA." (citing *Gomez–Perez v. Potter,* 553 U.S. 474, 479, 491 (2008))).

When a Title VII or ADEA plaintiff does not offer direct evidence of discrimination or retaliation, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Holcomb v. Powell*, 433 F.3d 889,895 (D.C. Cir. 2006). Under that framework, the plaintiff must initially establish a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. The three essential elements of a disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly situated employees outside the protected class. *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013). Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act. *Rochon*, 438 F.3d at 1219–20. Once the plaintiff succeeds in making her *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In employment discrimination and retaliation cases, summary judgment usually focuses on the employer's asserted non-discriminatory or non-retaliatory reasons for its actions. As the D.C. Circuit pronounced in *Brady v. Office of the Sergeant at Arms*:

> [W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.* Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). The Circuit has since offered that "*Brady*'s suggested preference for merits resolution on the third prong [of the *McDonnell Douglas* framework] is just that—a suggestion, which the District Court should follow only when feasible," *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).

Still, the "central question" on summary judgment will usually be whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). In answering that inquiry, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka*, 156 F.3d at 1289); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a

plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

A plaintiff may carry her rebuttal burden by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256), by, for example, demonstrating that "the employer is lying about the underlying facts" that formed the predicate for the employment action, *Brady*, 520 F.3d at 495. But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. A plaintiff may also come forward with comparative evidence that persons who are similarly situated to the plaintiff but are of a different race, sex, religion, or age have been treated more favorably by the employer. *Id.*

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

### III.   DISCUSSION

As a reminder, Judge Kollar-Kotelly ruled that the sole employment action that can support a discrimination or retaliation claim is Plaintiff's termination. *See Earle*, 2020 WL 95812, at *11–

12. That decision was made by Becker on September 18, 2018. *See* ECF No. 70-22 at 1–2; *see also* ECF No. 70-21 at 9 (Becker testifying at her deposition that she "made the decision [to remove Plaintiff] on September 18, 2018"). Allegations concerning Willis's negative rating of Plaintiff's performance for fiscal year 2017 and her placement on the PIP are relevant as "background and context" for those claims. *Earle*, 2020 WL 95812, at *12–13.

Here, the SEC has put forward a non-discriminatory, non-retaliatory reason for Plaintiff's termination—that her performance was unacceptable. Plaintiff argues both that the offered reason is not "legitimate" and that it is a pretext for illegal discrimination and retaliation. *See* ECF No. 72-1 at 34 (asserting "Defendant's agents" used findings that Plaintiff's job performance was unacceptable to conceal "the true reasons for [her] removal[,] . . . her gender, age, and religion"); ECF No. 75 at 13–18 (contending that the SEC has failed to proffer a legitimate reason for Plaintiff's termination). The undersigned addresses each of those arguments in turn.

First, however, the undersigned addresses Plaintiff's assertion of religious discrimination. Her cross motion/opposition brief asserts religious discrimination only three times in passing. *See* ECF No. 72-1 at 7 (stating, in the introductory paragraph of her brief, that Plaintiff "seeks summary judgment . . . on her claims of unlawful discrimination and retaliation based on gender, age, and religion"); *id.* at 33 (stating that Defendant unlawfully terminated Plaintiff "because she was an older, Jewish woman"); *id.* at 34 (stating that managers "removed Plaintiff on the basis of her gender, age, and religion, all of which made her an undesirable employee to Defendant's agents"). More, the section of her brief arguing that she established a prima facia case of discrimination and retaliation comprises four subsections, none of which is dedicated to religious discrimination: (1) "Plaintiff Presents Evidence of Discrimination," (2) "Plaintiff Presents a Gender Discrimination Claim," (3) "Plaintiff Presents an Age Discrimination Claim," and (4) "Plaintiff Presents a

24

Retaliation Claim." *Id.* at 35–41. Religion is not mentioned in any of those sections. *See id.*
Notwithstanding that fact, in her reply she insists that she has presented evidence that managers
"selected her for removal based upon three impermissible and discriminatory criteria (her age, sex,
and *religion*)." ECF No. 75 at 13 (emphasis added). That is inaccurate; she makes no meaningful
argument directed to religious discrimination at any step of the *McDonell Douglas* paradigm. "A
party forfeits an argument by failing to raise it in his opening brief. Mentioning an argument 'in
the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument,
and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1,
6 (D.C. Cir. 2019) (citations omitted) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C.
Cir. 2005)). For all those reasons, the undersigned recommends deeming Plaintiff's claims of
religious discrimination forfeited.[15]

### A.    Legitimate Non-Discriminatory, Non-Retaliatory Reason

In *Figueroa*, the D.C. Circuit reminded courts that, notwithstanding *Brady*'s instruction to
focus their attention on the question of pretext, the employer still has the burden to articulate a
legitimate non-discriminatory reason for the adverse employment action at issue. *See* 923 F.3d at
1087. There, the Circuit "stated that the following four factors are 'paramount in the analysis for
most cases.'" *Harris v. Noem*, No. 21-cv-1083, 2025 WL 915701, at *8 (D.D.C. Mar. 26, 2025)
(quoting *Figueroa*, 923 F.3d at 1087). First, the "employer must produce evidence that a factfinder
may consider at trial (or a summary judgment proceeding)." *Figueroa*, 923 F.3d at 1087. Second,
that evidence, if believed, should be sufficient to allow a reasonable factfinder to believe that "'the
employer's action was motivated by' a nondiscriminatory reason." *Id.* (quoting *Teneyck v. Omni*

---

[15] The undersigned notes, however, that any religious discrimination claim would fail for the same reasons that Plaintiff's other claims fail—she has not pointed to evidence to show that a reasonable jury could find that the legitimate, non-discriminatory reason the SEC has given for her termination was a pretext for impermissible discrimination.

*Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004)).  Third, the explanation should be "facially 'credible' in light of the proffered evidence."  *Id.* at 1088 (quoting *Bishopp v. District of Columbia*, 788 F.2d 781, 788–89 (D.C. Cir. 1986)).  Fourth, and finally, "because a primary focus of the second prong is to provide the employee 'a full and fair opportunity' to challenge the employer's explanation as pretextual," the proffered explanation should be "clear and reasonably specific." *Harris*, 2025 WL 915701, at *8 (quoting *Figueroa*, 923 F.3d at 1088).  Importantly, "the burden to show a legitimate non-discriminatory, non-retaliatory reason for the employment action 'is one of production'"; thus, "the employer 'need not [at this step] persuade the court that it was actually motivated by the proffered reasons.'" *Hartzler v. Mayorkas*, No. 20-cv-3801, 2022 WL 15419995, at *18 (D.D.C. Oct. 27, 2022) (first quoting *Smith v. Hartogenesis*, 541 F. Supp. 3d 1, 9 (D.D.C. 2021); and then quoting *Burdine*, 450 U.S. at 254)), *aff'd*, No. 22-5310, 2024 WL 3219489 (D.C. Cir. June 28, 2024).

Here, Plaintiff's brief in opposition to the SEC's motion for summary judgment and in support of its own motion merely states that "in evaluating Defendant's claim of a non-discriminatory reason for Plaintiff[']s termination, the Court should evaluate whether the proffered reason is 'legitimate,'" ECF No. 72-1 at 33; and that, because "Defendant did not comply with Chapter 43 in terminating Plaintiff, . . . the reason given for her termination is pretextual and, therefore, not legitimate," *id.* at 35.  That is, she fails to discuss the *Figueroa* factors at all or offer an alternative analysis.  Again, that is insufficient to properly raise the issue. *See, e.g.*, *Al-Tamimi*, 916 F.3d at 6 ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider*, 412 F.3d at 200 n.1).  To be sure, Plaintiff spends the bulk of her reply challenging the legitimacy of the SEC's proffered non-discriminatory reason, *see* ECF No. 75 at

26

13–20, but that, too, is insufficient, because "arguments raised first in a reply brief are generally considered forfeited." *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *36 (D.D.C. Apr. 3, 2025). The undersigned recommends the Court find that Plaintiff has forfeited her challenge to the "legitimacy" of the SEC's non-discriminatory reason for her termination.

In any event, the argument fails on the merits. The first inkling that Plaintiff misunderstands the proper inquiry has already been cited: her assertion that because "Defendant did not comply with Chapter 43 in terminating Plaintiff, . . . the reason given for her termination is pretextual *and, therefore*, not legitimate."[16] ECF No. 72-1 at 35 (emphasis added). But a major point of *Figueroa* is that the question of the "legitimacy" of a proffered non-discriminatory or non-retaliatory reason and the question of pretext are separate inquiries. *See Figueroa*, 923 F.3d at 1087 (distinguishing between the "third prong" of the *McDonnell Douglas* framework, which concerns pretext, and the "second prong," which concerns the articulation of a non-discriminatory reason for the employment action); *accord, e.g.*, *Jeffries v. Barr*, 965 F.3d 843, 859–60 (D.C. Cir. 2020). The reasoning of *Figueroa* further makes clear that, in the context of the burden-shifting analysis, a "legitimate" non-discriminatory, non-retaliatory reason—that is, one that is "facially 'credible' in light of the proffered evidence," *Figueroa*, 923 F.3d at 1088—can nevertheless "not [be] the true reason for the employment decision" and pretextual, *Burdine*, 450 U.S. at 256.

More problematic, though, is the pressure she puts on compliance with Chapter 43. In her reply, she focuses on whether the SEC's reason for terminating her employment—unacceptable job performance—is "*facially credible in light of the proffered evidence.*" ECF No. 75 at 14 (emphasis in original) (quoting *Figueroa*, 923 F.3d at 1087). She contends that "Defendant has

---

[16] Plaintiff does not contend that the evidence the SEC offers is inadmissible, that it is inadequate if believed to allow a factfinder to reasonably determine that Plaintiff's removal was motivated by a non-discriminatory or non-retaliatory motive, or that the explanation is insufficiently clear or specific to permit Plaintiff a fair opportunity to challenge it as pretextual. *See Figueroa*, 923 F.3d at 1087–88. That decision is well taken, as any such arguments would fail.

27

claimed that its action adverse to Plaintiff—her removal—was solely and simply a consequence of their appropriate application of Chapter 43 in the course of operations" but that she has shown that "Defendant ignored Chapter 43 completely, thereby rendering the proffered basis for Plaintiff's termination irrelevant to Defendant's actual actions in terminating Plaintiff." *Id.* at 14–15. That is, she maintains that "[i]f . . . Defendant did not comply with Chapter 43, then its proffered nondiscriminatory reason for Plaintiff's termination is *not credible* and Plaintiff's removal was unlawful; the presumption of discrimination or retaliation from Plaintiff's *prima facie* showing stands unrebutted as a matter of law." *Id.* (emphasis in original). That fundamentally distorts the SEC's argument. The agency does not "claim[]" that it removed Plaintiff because of its "appropriate application of Chapter 43," ECF No. 75 at 15; rather, it says that it removed her because her job performance was unacceptable. It has provided evidence to support that assertion: Willis' memo placing her on a PIP lists examples of unacceptable performance, *see* ECF No. 70-4 at 3–4; his memo of proposed removal does likewise, *see* ECF No. 70-19 at 6–15; and Becker's decision to remove her accepts that proposal after review of Willis' memo and its attachments and Plaintiff's written and oral responses, finding Plaintiff's "performance failures" to be "well-documented," ECF No. 70-22 at 1. That evidence of unacceptable performance is more than sufficient to meet the SEC's burden at this step, even if managers failed to comply with the procedures of Chapter 43.[17] That is to say, Defendant's finding that Plaintiff's performance was unacceptable

---

[17] Plaintiff's arguments that the SEC failed to adhere to the dictates of Chapter 43 would have been appropriate in an appeal of her dismissal to the Merit Systems Protection Board ("MSPB"). *See, e.g.*, *Harris v. SEC*, No. DC-0432-18-0390-I-1, 2018 WL 6682317 (M.S.P.B. Dec, 13, 2018) ("Where the agency removes an employee pursuant to Chapter 43, it must show by substantial evidence that: (1) the agency established valid performance standards (*see* 5 U.S.C. § 4302(b)(1)) and critical elements and communicated them to the appellant at the beginning of the performance appraisal period; (2) the appellant's performance fails to meet the established performance standards in one or more critical elements of her position; (3) the agency warned the appellant of the inadequacies of her performance during the appraisal period and gave her an adequate opportunity to improve; and (4) after an adequate improvement period, the appellant's performance remained unacceptable in at least one critical element."), *aff'd*, 972 F.3d 1307 (Fed. Cir. 2020). But that standard does not govern this discrimination case. Here, the question is not whether Defendant complied with Chapter 43, but whether it terminated Plaintiff because of her age, gender, religion, or protected activity.

can still be "authentic[]" even if the process used did not comply with Chapter 43.  ECF No. 75 at 18 ("This is not about the wisdom of Defendant's reason, but about its authenticity.").  Indeed, Plaintiff herself acknowledges that Chapter 43 was "simply the expedient that DERA used" to remove Plaintiff, *id.* at 11, rather than the legitimate non-discriminatory reason the SEC has articulated for that removal.

### B.      Pretext

#### 1.      Discrimination

Plaintiff's arguments that Defendant's non-discriminatory reason for her removal was merely a pretext for discrimination also set great store by the requirements of Chapter 43 and Defendant's alleged failure to abide by them.  Indeed, at times Plaintiff appears to contend that merely showing that there is a factual issue as to whether the SEC complied with Chapter 43 is sufficient to meet her burden to defeat Defendant's motion for summary judgment and that establishing that Defendant did not comply entitles her to summary judgment.[18]  *See, e.g.*, 72-1 at 35 ("Defendant did not comply with Chapter 43 in terminating Plaintiff, which demonstrates that the reason given for her termination is pretextual . . . .").  But, as explained in the section immediately above, the non-discriminatory reason the SEC has *actually* articulated is that Plaintiff's performance was unacceptable.  To defeat the SEC's motion for summary judgment, then, she must create an issue of fact as to whether *that* determination was camouflage for unlawful discrimination; to be entitled to summary judgment in her favor, she must establish the same thing as a matter of law.  To be clear, under governing Supreme Court (and D.C. Circuit) precedent, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false,

---

[18] Close readers may note that this Report and Recommendation often phrases Plaintiff's arguments in uncertain terms ("it seems" or "it appears," for example).  That is a product of Plaintiff's apparent (there it is) repeated conflation of violations of Chapter 43 with violations of Title VII and/or the ADEA, meaning her arguments often require more parsing than they should.

*and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original); *see also Figueroa*, 923 F.3d at 1086 ("'Proof of illicit motive is essential,' and the employee 'at all times' has the burden of proving 'that the defendant intentionally discriminated against' her." (quoting *Segar v. Smith*, 738 F.2d 1249, 1265, 1267 (D.C. Cir. 1984))).

Recall that the employment action at issue is Becker's decision to remove Plaintiff. "'[O]rdinarily, a discrimination plaintiff must show that *the decisionmaker*' did the discriminating . . . ." *Kalantaripour v. George Washington Med. Fac. Assocs.*, No. 21-cv-272, 2026 WL 352994, at *8 (D.D.C. Feb. 9, 2026) (emphasis in original) (quoting *Onyebuchi v. Howard Univ. Hosp.*, 731 F. Supp. 3d 1, 8 (D.D.C. 2024)).  Here, Plaintiff offers no evidence that Becker was motivated by discrimination.  Plaintiff testified at her deposition that she was unaware of any statements made or actions taken by Becker that would indicate a bias against "women, employees over 40, or people of the Jewish faith."  ECF No. 70-23 at 215; *see also* ECF No. 70-2, ¶ 64; ECF No. 71-1, ¶ 64.  Although Plaintiff purports to dispute the SEC's assertion in its statement of undisputed material facts that she "has no evidence that Dr. Becker considered [Plaintiff's] age, sex, or religion in deciding to uphold" Willis' removal proposal, ECF No. 70-2, ¶ 62, the evidence she points to does not contradict the SEC's statement.  Rather, it comprises testimony from Becker's deposition that Plaintiff insists demonstrates that Becker "simply accepted Willis' representations as to [Plaintiff's] failures."  ECF No. 71-1, ¶ 62 (citing ECF No. 70-21 at 27–28).  Indeed, Plaintiff states in response to that assertion in Defendant's statement of undisputed material facts that "*Willis, Bauguess, and Coronel* discriminated against Plaintiff on the basis of her gender and age,[19] Becker simply followed through by signing the ultimate instrument of the termination."  *Id.*

---

[19] As in her briefing, Plaintiff does not there assert that anyone discriminated against her based on her religion.

(emphasis added).  Accordingly, Plaintiff has admitted that she has no evidence that would indicate that Becker's decision to remove Plaintiff was motivated by unlawful discrimination.

That is not fatal to her claims, however.

> [T]he law is settled that an employer's liability for the discriminatory acts of its agents goes beyond the final decisionmaker—the person actually making the hiring or firing decision. The actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action.  This is commonly known as the "cat's paw" theory of liability.

*Steele v. Mattis*, 899 F.3d 943, 950–51 (D.C. Cir. 2018) (internal citations omitted) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–423 (2011)).  Under that theory of liability, the plaintiff must show that "[1] [the] supervisor perform[ed] an act motivated by [discriminatory] animus [2] that [was] *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act [was] a proximate cause of the ultimate employment action."  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (most alterations in original) (quoting *Staub*, 562 U.S. at 422).  Although courts have noted "the uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability," *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011), the D.C. Circuit has

> instruct[ed] that, when confronted with a cat's-paw theory of liability, the Court should reframe the search for pretext under *McDonnell Douglas* to ask whether—based on all of the evidence—a reasonable jury could find that the plaintiff has met

> the three prongs of cat's-[p]aw liability that the Supreme Court articulated in *Staub v. Proctor Hospital.*

*Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 362 n.4 (D.D.C. 2016) (citing *Morris*, 825 F.3d at 668–69), *aff'd*, 709 F. App'x 7 (D.C. Cir. 2017).[20]

"Here, *Staub*'s second prong is easily met: [Willis'] recommendation that" Plaintiff be removed for unacceptable performance "was clearly intended to cause such a [removal]." *Morris*, 825 F.3d at 668.  A reasonable jury could also find the third prong, which "requires that the [allegedly] biased supervisor's act be a proximate cause of the ultimate employment action," *id.* at 672, is met.  "Proximate cause requires only 'some direct relation' between the injury asserted and conduct alleged and excludes only those 'links that are too remote, purely contingent, or indirect.'" *Id.* (citation modified) (quoting *Staub*, 562 U.S. at 419).  "Generally, the existence of proximate cause is 'a factual issue for the jury.'" *Melkumyan v. Power*, No. 21-cv-2700, 2024 WL 1299366, at *12 (D.D.C. Mar. 24, 2024) (citation modified) (quoting *Cobb v. Wash. Metro. Area Transit Auth.*, No. 20-cv-3522, 2023 WL 3231443, at *5 (D.D.C. May 3, 2023).  "Indeed, 'only in "exceptional cases,"' where '"the evidence will not support a rational finding of proximate cause" by any reasonable jury,' may a court decide the question of proximate cause on a summary judgment motion." *Id.* (citation modified) (quoting *Cobb*, 2023 WL 3231443, at *5).  The Supreme Court has noted that even an "'independent investigation' does not break the causal chain between a supervisor's bias and an adverse employment action" where the final decisionmaker takes "the

---

[20] Plaintiff does not explicitly pursue a cat's paw theory in her briefing.  Although the undersigned could recommend that Plaintiff's failure to brief the issue should result in forfeiture, *see, e.g.*, *Arnoldi v. Bd. of Trs., Nat'l Gallery of Art* 557 F. Supp. 3d 105, 119 (D.D.C. 2021) ("[Plaintiff] could have advanced a cat's paw theory to allege that Willson influenced the deciding officials.  But she has not and therefore forfeits the argument."), that seems unjust where Plaintiff's papers include statements asserting that managers "discriminated against Plaintiff on the basis of her gender and age, Becker simply followed through by signing the ultimate instrument of the termination," ECF No. 71-1, ¶ 62; managers "set Plaintiff up for removal and Becker followed through," ECF No. 72-1 at 44 (some initial capitalization omitted); and Becker "simply accepted" representations as to Plaintiff's failures in the PIP, *id.*; all of which suggest a cat's paw theory.

supervisor's biased recommendation . . . 'into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Morris*, 825 F.3d at 672 (quoting *Staub*, 562 U.S. at 421).  Here, Plaintiff points to evidence that would allow a reasonable factfinder to determine that Willis' recommendation "colored [Becker's] evaluation" of Plaintiff's performance on the PIP.  *Id.*  Becker testified at her deposition that, for example, she based her determination that Plaintiff's work on the sample IFRS financial statement contained errors on "Willis' descriptions of the errors" and that she knew that Plaintiff's news release on the update to the IFRS FAQs was unacceptable based on Willis' report.  ECF No. 70-21 at 27–28.  And, in light of Plaintiff's theory that Willis' determination that she should be removed because she failed the PIP was merely the last step in a scheme that began with his negative evaluation of her performance in fiscal year 2017, the undersigned finds that Plaintiff has raised an issue of fact as to whether there is a sufficient causal connection between that earlier decision (which resulted in her place-ment on the PIP) and Willis' proposal to remove her.

That leaves the *Staub's* first prong: whether Willis' recommendation to remove Plaintiff was motivated by discriminatory animus.  Or, as the D.C. Circuit might describe the issue, whether "a reasonable jury could find that the [finding that Plaintiff's performance was unacceptable] was pretextual and that [Willis] was motivated by discriminatory animus when [he] recommended" removing her.[21]  *Morris*, 825 F.3d at 669.  The D.C. Circuit has recognized several ways that a

---

[21] As noted, Plaintiff occasionally states that Bauguess and Coronel discriminated against her.  *See, e.g.*, ECF No. 71-1, ¶ 62 ("Willis, Baguess, and Coronel discriminated against Plaintiff on the basis of her gender and age, Becker simply followed through by signing the ultimate instrument of termination.").  But Plaintiff does not contend that either of those individuals had a hand in rating her performance; rather, the accusation seems to stem from Bauguess and Coronel's participation in the plan to reorganize DERA, which Plaintiff asserts was the reason the department had to get rid of someone, *see, e.g.*, ECF No. 72-1 at 34 ("As to why anyone needed to be terminated at all, this was due to Defendant's agents' need to free up budget to create a new position in OSD for Plaintiff's supervisor, rating official Mike Willis.").  To be sure, Bauguess and Coronel reviewed Plaintiff's fiscal year 2017 final performance appraisal, *see* ECF No. 70-18 at 1, but there is no indication that they had any substantive role in evaluating her performance either in connection with the final performance review or the PIP.  Because Willis was the "only true decisionmaker"

33

plaintiff may "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation":

> by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).  Generously read, Plaintiff's briefing claims she was treated more poorly than similarly situated employees outside her protected groups and that her managers deviated from established procedures or criteria when they removed her. She also contends, more generally, that her performance did not merit an unacceptable rating, so that finding must have been fabricated.  The remainder of this section addresses each of those arguments.

a.    Disparate Treatment Based on Similarly Situated Comparators

"Where a plaintiff seeks an inference of discrimination based on 'disparate treatment,'" she has the burden to show "that 'all of the relevant aspects of [her] employment situation were "nearly identical" to those' of the other employees [outside her protected class] who did not suffer similar adverse employment actions."  *Bilal-Edwards v. United Plan. Org.*, 15 F. Supp. 3d 1, 14 (D.D.C. 2013) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995)); *see also, e.g.*, *Cox v. Nielsen*, No. 16-cv-1966, 2019 WL 1359806, at *11 (D.D.C. Mar. 26, 2019) ("To rebut an employer's stated reasons for its actions, a plaintiff may, among other things, come forward with comparative evidence that persons who are similarly situated to the plaintiff but are outside of her protected class have been treated more favorably by the employer.  A plaintiff is similarly situated to another individual if 'all of the relevant aspects of her

---

as to Plaintiff's performance and Bauguess and Coronel "merely approved" an evaluation, Bauguess and Coronel's conduct or belief "is simply not probative of pretext." *Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000).

employment situation are "nearly identical" to those of the comparator.'" (citation modified) (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999))).  Plaintiff fails to do so here.

Plaintiff appears to compare her treatment to "male SK-16s" at DERA and identifies Hamscher and Hankin by name, *see* ECF No. 72-1 at 28, 38; the other male SK-16 was Slavin, *see id.* at 12.  There is no basis for an inference of age (or religious) discrimination from any more favorable treatment those individuals received because Plaintiff offered no evidence as to their ages (or religions).  Thus, it is not clear that they are *differently* situated than she is such that their treatment could suggest discriminatory animus.  *See Charon v. Anasazi Grp.*, No. 25-cv-430, 2025 WL 2591785, at *5 (D.D.C. Sep. 8, 2025) ("[T]o support 'an inference of discrimination it is essential that the similarly situated comparator not share the plaintiff's protected trait.'" (citation modified) (quoting *Mitchell v. Garland*, No. 23-cv-2412, 2024 WL 3251217, at *4 (D.D.C. July 1, 2024))).

Even if there were such evidence, the SEC argued in its opening brief that Plaintiff could not identify any similarly situated employees—specifically, employees at Plaintiff's pay grade with similar job titles and disciplinary record—and explicitly contended that Hamscher and Hankin are not appropriate comparators because they occupied different positions with different expertise and did not have a disciplinary record like Plaintiff's.  *See* ECF No. 70-1 at 17.  Plaintiff made no attempt to address that issue in her opposition, stating merely that "[t]he FY2017 'failures' of male SK-16s, including those of Hamscher and Hankin, did not result in unacceptable 'ratings'" and that "Willis and Defendant's other agents clearly treated Plaintiff differently from the male SK-16s." ECF No. 72-1 at 28, 38.  Because Plaintiff fails to address the SEC's argument that she has identified no similarly situated employees outside her protected class(es), the undersigned recommends finding that she has conceded Defendant's argument that she has failed to raise an inference of discrimination through comparator evidence.  *See, e.g., Sai v. Dep't of*

35

*Homeland Sec.*, 99 F. Supp. 3d 50, 68 (D.D.C. 2015) ("[I]f a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quoting *Burnett v. Sharma*, 511 F. Supp. 2d 136, 145–46 (D.D.C. 2007))).

In any case, Plaintiff cannot establish that "all . . . relevant aspects" of her employment situation were "nearly identical" to those of Hamscher, Hankin, or Slavin. There is no evidence that Hamscher, Hankin, or Slavin performed unacceptably and were placed on a PIP without being recommended for termination. *Holbrook*, 196 F.3d at 261 ("To prove that she is similarly situated to a male employee, a female plaintiff must demonstrate that she and the allegedly similarly situated male employee were charged with offenses of 'comparable seriousness.'" (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 488 (8th Cir. 1998))). More, the evidence shows that they had different job titles and less seniority than Plaintiff. Plaintiff was a Staff Accountant, while Hamscher was an IT Project Manager and Slavin and Hankin were IT Specialists. *See* ECF No. 70-17 at 9. And Plaintiff "had the greatest longevity as an employee of the SEC." ECF No. 72-2 at 12, ¶ 42. Courts have found that to be considered similarly situated for the purposes of an inference of discrimination, comparators should have similar "experience, seniority, or expertise" and job titles. *Wilson*, 2025 WL 1000666, at *31 (quoting *Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013))); *see also Bilal-Edwards*, 15 F. Supp. 3d at 14 (noting that a comparator who was "both male and 'lower in seniority'" than the female plaintiff was not similarly situated (quoting *Neuren*, 43 F.3d at 1514)). Plaintiff has admitted that she "was the only SK-16 at DERA that was a Certified Public Accountant, and the only SK-16 who was not an IT specialist or project manager. As such, she was uniquely positioned with responsibilities focusing 'accounting and reporting' while the others worked in information technology." ECF No. 70-2, ¶ 40; ECF

36

No. 71-1, ¶ 40.  Her expertise, seniority, and "unique[] position[]," *id.*, are clearly relevant to managers' expectations of her performance, making the proposed comparators "too dissimilar to draw any inference of discriminatory treatment," *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174–75 (D.C. Cir. 2021); *cf. Sapp v. U.S. Att'y Gen.*, 676 F. App'x 878, 882 (11th Cir. 2017) (indicating that an employee's "unique position" may make it difficult to find "a comparator similarly situated in all relevant respects").

Accordingly, Plaintiff has failed to raise an inference of discrimination using Hamscher, Hankin, or Slavin as comparators.

> b.       Disparate Treatment Based on Deviation from Established Procedures

The meat of Plaintiff's argument relies, as noted above, on Plaintiff's contention that Willis failed to comply with Chapter 43 in managing her performance.  According to the Federal Circuit:

> In order to properly remove or demote an employee under chapter 43, the agency must have (1) established a performance appraisal system approved by the Office of Personnel Management, (2) communicated objective and reasonable written performance standards and critical elements of an employee's position to her at the beginning of the appraisal period, (3) warned her of inadequacies in critical elements during the appraisal period, and (4) counseled and afforded her an opportunity for improvement after proper notice.

*Harris*, 972 F.3d at 1316.  Here, Plaintiff asserts that Willis did not provide her with a performance plan but instead "had *her* identify her objectives"; relied on "the SEC's so-called critical element of 'achieving results in [occupation],'" which "is a tautology in employment" and "provides an employee with no information about what specific job results the employee must produce and whether those results are critical"; and failed to tell her what to prioritize or to identify which of

37

her "many assignments, tasks, responsibilities, etc. were 'critical,'" thus allowing him to deem even "small task[s] . . . worthy of mention in her rating." ECF No. 72-1 at 43.

The undersigned will assume for the sake of argument that Plaintiff has at least raised an issue of fact as to whether Willis complied with Chapter 43 in his management of Plaintiff related to fiscal year 2017, which ultimately led to his recommendation of removal. But that assumption does not get Plaintiff very far. Although "an 'employer's failure to follow established procedures or criteria' can be grounds for finding pretext in some circumstances," that failure "'alone[] may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 72–73 (D.D.C. 2010) (first quoting *Brady*, 520 F.3d at 495 n.3; and then quoting *Fischbach*, 86 F.3d at 1183)). Rather, a plaintiff relying on a failure to follow prescribed procedures as evidence of pretext must generally show that the employer regularly followed those procedures. *See Fischbach*, 86 F.3d at 1183 (finding an employer's failure to follow its own regulations and procedures "lends no support at all" to an inference of pretext where such failure "had become the norm"). That is, without evidence that the allegedly incorrect procedures used to impose an adverse employment action were themselves a "deviation from [the employer's] standard practice," the procedures used will not support an inference of pretext. *Lamaute v. Power*, No. 19-cv-3702, 2023 WL 5224654, at *17 (D.D.C. Aug. 14, 2023); *id.* at *19 (finding that an "inconsistency with internal best practices" does not "rise[] to the level of a discriminatory inference"); *see also, e.g.*, *Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020) (stating that "an unexplained deviation from [an agency's] standard practices . . . 'can justify an inference of discriminatory motive'" (quoting *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003)); *Huey v. United Parcel Serv.*, 165 F.3d 1084, 1086 (7th Cir. 1999) (noting that proof that "the handling of [the plaintiff's] situation departed from the

38

[defendant's] norm" might imply a prohibited motivation); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1558 (5th Cir. 1996) ("[F]ailing to follow industry custom or federal regulations is not evidence from which a jury could infer racial animus unless Simms showed that First Gibraltar normally conformed with industry custom or complied with federal regulations in handling similar, 'non-protected' applications."). Plaintiff has provided no evidence that Willis (or any other manager) ordinarily followed the requirements of Chapter 43 and deviated from "the norm" in dealing with her. For example, although Plaintiff's expert opines that the PIP Willis put her on was unusually onerous, *see* ECF No. 66-1 at 21–22, Plaintiff provides no evidence that DERA managers generally issued less onerous performance improvement plans.

Indeed, the record evidence indicates that Plaintiff was treated no differently than others under Willis' supervision with regard to the requirements of Chapter 43. She complains that, rather than developing a performance plan for her, Willis "had *her* identify her [own] objectives." ECF No. 72-1 at 43. The evidence shows that he asked the same thing of others he supervised, including Hamscher, Hankin, and Slavin. *See* ECF No. 70-10. Plaintiff objects to the "so-called critical element of 'achieving results in [occupation],'" because it is "a tautology" and "provides an employee with no information about what specific job results the employee must produce and whether those results are critical." ECF No. 72-1 at 43. But the evidence shows that "achieving results in occupation" was defined as a critical element for all SEC personnel on the SK pay scale. *See* ECF No. 70-9 at 4 (identifying "Achieving Results in Occupation" and "Teamwork and Collaboration" as the critical elements for non-supervisory employees on the SK pay scale and "Achieving Results in Occupation," "Teamwork and Collaboration," and "Leading People" as the critical elements for supervisory personnel on the SK pay scale). That is, there is no suggestion that the conduct complained of was a deviation from standard procedure—even if it violated

39

Chapter 43 or was otherwise misguided.  Plaintiff may have shown that Willis was working under bad policies or was himself a bad—even incompetent—manager.  But "showing that an employer is a bad manager does not demonstrate pretext because 'the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions.'" *Liner v. Dontron, Inc.*, 9 F. App'x 523, 529 (7th Cir. 2001) (quoting *Wade v. Lerner New York, Inc.,* 243 F.3d 319, 323 (7th Cir.2001)); *see also Harris*, 2025 WL 915701, at *27 ("Title VII does not protect employees from bad managers or workplace conflicts unconnected to discrimination; sometimes people just do not get along." (quoting *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 47 (D.D.C. 2017))); *Moini v. Univ. of Tex. at Austin*, 832 F. Supp. 2d 710, 724 (W.D. Tex. 2011) (noting that an employer's procedures can be "inefficient, unreasonable, or even downright stupid" as long as they are "not illegally discriminatory").

c.        Fabrication of the SEC's Non-Discriminatory Reason

Plaintiff asserts that her managers "used an unstructured hodgepodge of *ex post facto* 'failed tasks' to construct what appears to the uneducated eye to be 'unacceptable performance.'" ECF No. 72-1 at 41.  That is, she appears to contend that the performance failures were fabricated to get Plaintiff out of the way.  The argument is unsuccessful.

True, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  But where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.  A court's job is not "to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and

40

acted in good faith upon those beliefs." *Crockett v. Richardson*, 127 F. Supp. 2d 40, 47 (D.D.C. 2001); *see also Fischbach*, 86 F.3d at 1183 ("[T]he issue is not 'the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" (citation modified) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992))). "[B]ecause a plaintiff's own view of her performance says little about the whether the decisionmaker honestly believed its proffered non-discriminatory, non-retaliatory reasons," it is "clear that, while perhaps not completely irrelevant, 'an employee's subjective assessment of her own performance is insufficient to establish pretext' standing alone." *Hartzler*, 2022 WL 15419995, at *25 (citation modified) (quoting *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 192 (D.D.C. 2011)). Accordingly, "where, as here, 'a plaintiff aims to demonstrate that an employer's performance-based explanation is pretext,' they 'must provide evidence suggesting that the explanation was a lie.'" *Id.* (citation modified) (quoting *Robertson*, 767 F. Supp. 2d at 192). For example, a plaintiff might point out an assessment too farfetched to be believed. *See, e.g.*, *Grosdidier*, 709 F.3d at 26 ("[E]vidence of pretext might include 'an error too obvious to be unintentional.'" (quoting *Fishbach*, 86 F.3d at 1183)). And, ultimately, the plaintiff must show "that discrimination was the real reason" for the adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at 515. Here, Plaintiff must present evidence tending to show that Willis did not honestly believe that Plaintiff had performed unacceptably in critical elements of her job and that his negative rating was illegally discriminatory. That she fails to do.

Willis' February 2018 final performance review of Plaintiff for fiscal year 2017 (which Plaintiff asserts was an early step in the scheme to fire her) found that she had performed unacceptably on the critical element of "Achieving Results in Occupation" because she "struggled to produce a comprehensive, proactive project plan for the IFRS Taxonomy and related activities";

41

offered a "non-responsive" answer to "questions on the IFRS Taxonomy from a market partici-

pant"; required Willis to "reassign[] several projects from her project portfolio to other OSD staff"

and even so her "contributions were often reactive to requests at or after timing deadlines rather

than proactively delivered"; produced "project deliverables" related to the IFRS taxonomy, includ-

ing the IFRS FAQs page and the IFRS taxonomy sample filing, "that required significant and

repetitive versioning reviews by her direct supervisor and/or other DERA staff," which "adversely

impacted their working productivity"; and, in sum, "lacked the proactive planning and compre-

hension expected of an SK-16" and failed to "take responsibility for the assigned projects, related

work actions, and completion tasks." ECF No. 70-18 at 7–9. Plaintiff does not identify evidence

showing that those criticisms are false or, more to the point, that Willis did not "honestly believe"

that Plaintiff had performed as described, *Crockett*, 127 F. Supp. 2d at 47.[22] She does not identify

evidence showing that the projects on which Willis found she underperformed were not within her

job responsibilities or that Willis did not believe they were among her job responsibilities—indeed,

---

[22] That Willis nominated the seventeen-person team that worked on the IFRS taxonomy for two awards in March 2017 does not support an inference that he disbelieved his statements about Plaintiff's performance failures when he made them months later. *See* ECF No. 72-2 at 51–56. The record before the undersigned indicates that Willis became disillusioned with Plaintiff's performance around June 2017, specifically about her stewardship of the project plan for the IFRS taxonomy, which he had recently assigned to her. *See* ECF No. 72-2 at 137–39 (emails of June 17, 2017); ECF No. 70-15 (email of June 26, 2017). Moreover, a major point of Willis' review is that other staff picked up the slack caused by her deficient work product. *See* ECF No. 70-18 at 8–9. This Court and others have found that "[a]n employer's description of an employee's performance as unsatisfactory will not be deemed pretextual just because the employee was a good performer at an earlier time." *Harris*, 2025 WL 915701, at *23 (quoting *Hartzler*, 2022 WL 15419995, at *27); *see also, e.g.*, *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("[T]he fact that [the plaintiff] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination."); *Khan v. Holder*, 37 F. Supp. 3d 213, 227 (D.D.C. 2014) (noting that "[t]he fact that [a] plaintiff may have met expectations in the past is irrelevant to the question" of whether decisionmakers believed her later performance was satisfactory at the time of the challenged decision); *Brady v. Boehringer Ingelheim Pharms., Inc.*, No. 05 C 5934, 2008 WL 4425445, at *6 (N.D. Ill. Sep. 26, 2008) (finding the fact that the plaintiff had received awards for her job performance in the past to be flimsy evidence that she continued to perform satisfactorily). Significantly, Plaintiff's briefing does not argue that the nominations are evidence of pretext—they are mentioned in her cross-motion/opposition brief and reply brief but not substantively addressed in either of those filings. *See* ECF No. 72-1 at 16; ECF No. 75 at 7, 16. Indeed, her opening brief (appearing to agree with the cases cited above) insists that Plaintiff's history of "exemplary performance" is irrelevant to pretext—specifically, she states that the issue of pretext "does not depend on consideration" of that performance history because "[t]he pretext part of the story is Defendant's purported use of Chapter 43." ECF No. 72-1 at 36 n.29.

Plaintiff stated that the IFRS taxonomy was one of her "two primary projects," identified herself as the "[s]ubject matter expert for taxonomies and IFRS on [the Office of Structured Disclosure's] public email inbox to support the public in regulatory compliance," and touted her assumption of "primary responsibility for processes to update" SEC-maintained taxonomies." ECF No. 70-18 at 7–8; *see also* ECF No. 70-2, ¶ 3; ECF No. 71-1, ¶ 3 (admitting that her job duties included "[m]anaging the adoption, maintenance and providing technical review of the [IFRS] Taxonomy and related artifacts"). Plaintiff does not identify evidence showing that Willis did not believe that the failures he catalogued were sufficient to merit a rating of unacceptable on the critical element of "Achieving Results in Occupation." Rather, she seems to rely on her opinion that achieving results in one's occupation is "a tautology in employment" and therefore cannot be a critical element. ECF No. 72-1 at 43. That opinion is of questionable relevance, *see, e.g.*, *Hartzler*, 2022 WL 15419995, at \*25, and, again, she points to no evidence to support it—even her expert's report, which spouts largely inadmissible opinions, does not offer that one. More importantly, nothing suggests that Willis did not believe it was a properly formulated critical element. Nor should he have; as noted, it was one of the critical elements applied SEC-wide to employees on the SK pay scale. *See* ECF No. 70-9 at 4.

The same deficiency—a lack of evidence supporting Plaintiff's position—plagues any argument that the PIP or the proposed removal could support an inference of pretext. As to the PIP, Plaintiff's expert opines that it was unusually onerous. *See* ECF No. 66-1 at 21–22. But Plaintiff does not identify anything in the record showing that Willis did not believe it was appropriately scaled. The only thing that comes close is her complaint, made in her affidavit submitted with her cross-motion/opposition brief, that Willis had been warned that the IFRS taxonomy sample filing, which was assigned to Plaintiff "in the PIP," would take hundreds of hours to complete, and yet

Willis made it due "within six days of the PIP's commencement," that is, on February 27, 2018. ECF No. 72-2 at 29, ¶¶ 157, 159.  But other evidence she submitted shows that she was staffed to that project well before implementation of the PIP: an email of November 9, 2017, establishes that Willis had already assigned Plaintiff and another employee to that project.  *See* ECF No. 72-2 at 147.  That is, Plaintiff did not have to complete a complex project start-to-finish in six days, as her affidavit implies.  She and a colleague had been assigned the project months before the PIP was imposed.

Plaintiff also doesn't identify evidence showing that Willis fabricated his belief that she failed the PIP and should be removed.  A footnote in her reply brief points out that she submitted rebuttals, both written and oral, to the removal proposal after it was issued.  *See* ECF No. 75 at 17 n.9 (citing ECF No. 72-4, ¶¶ 53, 55; ECF No. 72-2 at 264–96).  That same footnote cites her own deposition testimony that disagrees with Willis' assessment of her performance on the PIP.  *See id.* (citing ECF No. 70-23 at 134–80).  But, "marching point-by-point through each of the alleged deficiencies noted" in the removal proposal—which, by the way, Plaintiff does not do in her brief, merely relying on citations to the record in that footnote, *see United States v. Law*, 528 F.3d 888, 908 n.11 (D.C. Cir. 2008) (deeming an argument forfeited where it was raised only in a footnote)—"and arguing they are either incorrect or otherwise flawed" is generally insufficient to establish pretext, because "[i]t is not this Court's role to dispute [the employer's] findings" without something more to indicate an impermissible motivation.  *Hartzler*, 2022 WL 15419995, at *25 (quoting *Nwachuku v. Jackson*, 605 F. Supp. 2d 285, 290 (D.D.C. 2009), *aff'd*, 368 F. App'x 152 (D.C. Cir. 2010)).  To put it another way, a "plaintiff's attempt to show that h[er] superiors were wrong about h[er] performance does nothing to prove that their proffered reasons for [the adverse employment action] were a façade." *Hussain v. Principi*, 344 F. Supp. 2d 86, 98 (D.D.C. 2004),

*aff'd sub nom. Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006)); *see also Khan*, 37 F. Supp. 3d at 228 ("Because there is no evidence of 'glaring errors' that would be 'probative of pretext,' any evidence that plaintiff was performing better than Ford reported does not show that plaintiff's placement on the PIP was pretextual." (internal citation omitted) (quoting *Grosdidier*, 709 F.3d at 26)); *Ey v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013) ("[T]he plaintiff's own disagreement with his supervisors' view is certainly not sufficient to establish pretext or discrimination."); *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for 'plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decisionmaker which is relevant.'" (citation modified) (quoting *Smith v. Chamber of Commerce of the U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986))), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002), *abrogated on other grounds by Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006)). In short, Plaintiff has not "provide[d] evidence suggesting that the [employer's performance-based] explanation was a lie." *Hartzler*, 2022 WL 15419995, at *25 (quoting *Robertson*, 767 F. Supp. 2d at 192).

*     *     *     *     *

The final substantive section of Plaintiff's cross-motion/opposition brief, which tries to show that the SEC's actions were intended to "capture her compensation" to fund a new position, exposes fundamental problems with her argument:

> The SEC cannot and does not argue that it complied with the letter (let alone the spirit) of Chapter 43. The uncontested facts support strong inferences of an unpleasant story: (1) Bauguess promised Willis the status and compensation of a[] [Senior Officer] position to lure Willis from his much higher [former] compensation to the SEC; (2) Bauguess intended to use Plaintiff's and [the Office of Structured Disclosure's] success in achieving acceptance of the IFRS Taxonomy in December 2016 and March 2017 to create the new [Senior Officer] position; (3) Bauguess and Willis learned that the [Senior Officer] position was not funded and

45

> Willis could not be promoted into it unless and until it was funded; (4) [the Office of Human Resources] and DERA were constrained, at least in part, by the Donald J. Trump Freeze Order; (5) Plaintiff was no longer needed to further the IFRS Taxonomy project, she was senior enough to retire (they thought), her compensation was significant to the budget of DERA (and [the Office of Structured Disclosure]), she was disliked (thanks to Willis' actions) by her male colleagues, and she would likely just retire. Plaintiff's resistance, however, threw a proverbial monkey-wrench into this plan, stalled the funding of the [Office of Structured Disclosure] expansion, and revealed the motives of its supporters. Plaintiff paid for this with her termination.

ECF No. 72-1 at 45–46. The undersigned has already explained that managers' compliance or non-compliance with Chapter 43 is a red herring. And although Plaintiff's "story"—assuming it is true for the purposes of this discussion—may be "unpleasant," as shown above Plaintiff has offered no evidence indicating that the "motives of [the scheme's] supporters" were discriminatory. Again, evidence that a plaintiff's managers were bad, or incompetent, or even venal, is not sufficient to show that they engaged in illegal discrimination. *See, e.g.*, *Liner*, 9 F. App'x at 529; *Harris*, 2025 WL 915701, at \*27. Plaintiff's narrative instead asserts that her managers made an economic decision—that is, their goal was to fund the new senior officer position as part of the restructuring of the department. But "decisions motivated by economic concerns do not violate the ADEA," even if they are "driven by factors that are empirically intertwined with age." *Chapotkat v. Cnty. of Rockland*, 605 F. App'x 24, 26 (2d Cir. 2015) (quoting *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 105 (2d Cir. 1997)); *see also Hazen Paper Co. v. Biggens*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"); *Bramble v. Am. Postal Workers Union*, 135 F.3d 21, 26 (1st Cir. 1998) ("*Hazen Paper* explains that where an employment decision is premised upon an age-correlated but analytically distinct factor, a violation of the ADEA has occurred only if there is additional evidence that the employer was motivated by an age-discriminatory animus."); *Ashe v.*

46

*Distribuidora Norma Inc.*, 7 F. Supp. 3d 134, 153 (D.P.R. 2014) ("[H]igh salary is not necessarily correlated with age.  Therefore, Defendants may legally fire Plaintiff because of his high salary without violating any ADEA provision."); *Geiger v. AT&T Corp.*, 962 F. Supp. 637, 644 (E.D. Pa. 1997) ("[A]n employer's consideration of retirement status is insufficient to defeat summary judgment on an ADEA claim.  The plaintiff must demonstrate the existence of a factual issue regarding whether an employer has attempted to use retirement as a shield or proxy for age discrimination."). And under any non-discrimination statute, including Title VII, when facing a motion for summary judgment—the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events," *Nasser*, 962 F. Supp. 2d at 242 (quoting *Springer*, 518 F.3d at 484)—a litigant must show that "the record, taken as a whole," would "permit a reasonable trier of fact to find that 'the most likely alternative explanation' for h[er] termination" was impermissible discrimination, *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (quoting *Reeves*, 530 U.S. at 147); *see also, e.g.*, *Lyons v. City of Alexandria*, No. 19-cv-576, 2020 WL 2832403, at *4 n.5 (E.D. Va. May 12, 2020) ("Certainly by the summary judgment stage, [the plaintiff] is required to establish 'that discrimination is a more likely reason for this disparate treatment rather than any other "obvious alternative explanation" that is present and "justified by nondiscriminatory intent."'" (citation modified) (quoting *Tabb v. Bd. of Educ.*, No. 17-cv-730, 2019 WL 688655 (M.D.N.C. Feb. 19, 2019)), *aff'd*, 35 F.4th 285 (4th Cir. 2022)).  Here, even if Plaintiff's managers' reasons for terminating her were neither

47

"wise, [nor] fair, [nor] correct," *Crockett*, 127 F. Supp. 2d at 47, she has not shown they were discriminatory.

>  2.  Retaliation

Plaintiff's retaliation claim fares no better.  Timing matters in a retaliation claim, because both law and logic dictate that a retaliatory act must post-date the conduct motivating it.  *See, e.g.*, *Barnes v. Hegseth*, No. 23-cv-932, 2025 WL 915564, at *4 (D.D.C. Mar. 26, 2025) ("[T]he fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." (quoting *Lewis v. Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009))).  "[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation." *Terveer v. Billington*, 34 F. Supp. 3d 100, 119 (D.D.C. 2014) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.")).  Not only that, but "an employer cannot retaliate against an employee for protected activity unless it knows that the employee has engaged in that activity." *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 23 (D.D.C. 2024); *see also Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019) ("Common sense teaches that an employer cannot retaliate against conduct of which it was unaware.").

Recall the timeline.  It is undisputed that Willis told Plaintiff on November 8, 2017, that she would be rated unacceptable for fiscal year 2017.  *See* ECF No. 70-2, ¶ 58; ECF No. 71-1, ¶ 58; ECF No. 70-23 at 107.  Plaintiff acknowledges that an unacceptable rating required her to be placed on a PIP.  *See* ECF No. 70-2, ¶ 58; ECF No. 71-1, ¶ 58. Thereafter, she contacted the EEO

Office on January 23, 2018. *See* ECF No. 72-2 at 26, ¶ 131. She was officially rated unacceptable and placed on the PIP on February 20, 2018. *See* ECF No. 70-4; ECF No. 70-18. She filed her formal complaint on April 27, 2018. *See* ECF No. 70-2, ¶ 42; ECF No. 71-1, ¶ 42. Willis recommended her removal on July 30, 2018. *See* ECF No. 70-19. Becker approved her removal on September 18, 2018. *See* ECF No. 70-22.

Plaintiff's theory of the case is that "Willis and Bauguess set up Plaintiff for removal, beginning in June 2017," because they learned in late May 2017 "that the new senior officer position and . . . assistant director position would not be authorized." ECF No. 72-1 at 44–45; *see also id.* at 45–46. That is, she posits a scheme to remove her that commenced months before she engaged in any protected activity. That is true even if the scheme were deemed to have begun with Willis' determination that she would be rated unacceptable in November 2017. As such, she has argued herself out of a retaliation claim, because "an adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation." *Terveer*, 34 F. Supp. 3d at 119.

A more conventional analysis that does not rely on Plaintiff's allegations of a long-running plot to dismiss her also results in summary judgment for Defendant. Although Plaintiff is cagey about when Becker had notice of Plaintiff's protected activity, stating in response to the SEC's assertion in its statement of undisputed material facts that Becker learned of Plaintiff's EEO claim in August 2018, *see* ECF No. 70-2, ¶ 61, that Becker was "made aware of the claims . . . on September 14, 2018," ECF No. 71-1, ¶ 61, but suggesting in her cross-motion/opposition brief that Becker may have known about Plaintiff's claim on or soon after Becker became head of DERA at the end of May 2018, *see* ECF No. 72-1 at 39, it is undisputed that Becker knew of the protected

49

activity before she made the decision to remove Plaintiff in September 2018—the only decision Becker made in this case.

But other than that timing-based argument, Plaintiff makes no attempt to show Becker harbored a retaliatory motive and the evidence would not support such a finding. For one thing, Becker was not named in Plaintiff's EEO complaint or in the May 2, 2018, whistleblower report that accompanied it. *See* ECF No. 72-2 at 151–52, 187–244. Courts have found that an individual who has not been accused of wrongdoing is unlikely to retaliate. *See, e.g.*, *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) ("[N]o rational juror could conclude that if Kasunic assaulted Wright, it was in retaliation for Wright's having written, some 10 weeks earlier, a letter that did not name Kasunic or any other officers and complained of an incident in which Kasunic was not a participant."); *Iacob v. Las Vegas Metro. Police Dep't*, No. 14-cv-923, 2017 WL 553388, at *7 (D. Nev. Feb. 10, 2017) (finding that a supervisor who was not named in the plaintiff's complaint of discrimination was unlikely to retaliate), *aff'd*, 703 F. App'x 550 (9th Cir. 2017); *Patterson v. Apple Computer, Inc.*, No. C 04-0405, 2005 WL 2277005, at *21 (N.D. Cal. Sep. 19, 2005) (finding that an individual who was "not named by plaintiff in any administrative charge or complaint" until after the alleged retaliatory act "would have had no reason to retaliate against plaintiff"), *aff'd*, 256 F. App'x 165 (9th Cir. 2007). More, in response to Defendant's assertion in its statement of undisputed facts that Plaintiff "has no evidence that Dr. Becker considered [Plaintiff's] prior EEO activity in deciding to uphold" the proposal for removal, ECF No. 70-2, ¶ 63, Plaintiff offers only that Becker "had been made aware of [Plaintiff's] claims" prior to the decision on removal, ECF No 71-1, ¶ 63. But showing that the decisionmaker had knowledge of protected activity "is utterly insufficient to sustain a plaintiff's burden on summary judgment." *Mera v. Garland*, No. 20-cv-2127, 2024 WL 1253856, at *20 (D.D.C. Mar. 25, 2024), *aff'd sub nom. Mera v. Bondi*, No. 24-

5125, 2025 WL 1418164 (D.C. Cir. May 16, 2025); *cf. Tyes-Williams v. Garland*, No. 17-cv-1191, 2021 WL 4262631, at *4 (D.D.C. Sep. 20, 2021) ("[A] decisionmaker's knowledge of an applicant's race does not suggest—let alone prove—that he discriminated against the applicant."). Indeed, if notice of protected activity were "enough to establish causation and to rebut the employer's asserted rationale, then it would collapse the *McDonnell Douglas* analysis into the *prima facie* case." *Kennedy v. Dep't of Transp.*, No. 22-cv-645, 2023 WL 9645239, at *6 (M.D. Ala. Dec. 12, 2023) (quoting *Chavous v. City of Saint Petersburg*, 576 F. Supp. 3d 1040, 1062 n.5 (M.D. Fla. 2021)), *report and recommendation adopted*, 2024 WL 604673 (M.D. Ala. Feb. 13, 2024); *cf. Hunter v. Wash. Metro. Transit Auth.*, No. 22-cv-3552, 2026 WL 593314, at *6 (D.D.C. Mar. 3, 2026) ("To 'defeat the presumption that the employer's proffered explanations are genuine' and withstand a motion for summary judgment, an employee must offer 'positive evidence beyond mere proximity' [between notice of the protected activity and the alleged retaliatory act]. If the rule were otherwise, 'then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.'" (citation modified) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007))). Finally, Plaintiff maintains that "Becker was no independent decision-maker, she was merely the executioner of a pre-baked decision." ECF No. 72-1 at 40–41. That is, she disclaims that Becker's decision was driven by retaliation—it was merely a rubber stamp. Taking Plaintiff at her word, the undersigned finds that a jury could not find a retaliatory motive in Becker's decision on Willis' recommendation that Plaintiff should be removed.

As above, however, Plaintiff could rely on a cat's paw theory of liability, which courts in this Circuit have applied to retaliation claims. *See, e.g.*, *Burton v. Donovan*, 210 F. Supp. 3d 203, 216 (D.D.C. 2016) ("Defendant may still be held liable under a 'cat's paw' theory of retaliation."

51

(citing, among other cases, *Walker v. Johnson*, 798 F.3d 1085, 1095–96 (D.C. Cir. 2015)).  And she suggests such a theory with the assertion cited above, that Becker "was merely the executioner of a pre-baked decision."  ECF No. 72-1 at 41.  But to succeed, Plaintiff must show that Willis engaged in an adverse employment action against Plaintiff after he had notice of her protected activity.  *See, e.g.*, *Singletary*, 939 F.3d at 300; *Abdelhamid.*, 744 F. Supp. 3d at 23.  That she cannot do.  It is undisputed that Willis did not learn of Plaintiff's EEO claim until sometime in early August 2018.  *See* ECF No. 70-2, ¶ 59; ECF No. 71-1, ¶ 59.  That was more than eight months *after* Willis informed Plaintiff in November 2017 that she would receive an unacceptable rating for fiscal year 2017 (which according to Plaintiff was an early salvo in the battle to remove her), *see* ECF No. 70-23 at 107–09; ECF No. 72-1 at 45; more than five months after Plaintiff received her negative performance rating and was placed on the PIP in February 2018, *see* ECF No. 70-2, ¶ 20; ECF No. 71-1, ¶ 20; ECF No. 70-4; and even after Willis recommended her removal in July 2018, *see* ECF No. 70-19.  Thus, none of that conduct could be retaliatory because Willis did not have notice of Plaintiff's protected activity at the relevant times.  Indeed, when he received such notice in August 2018, his participation had ended because he had already proposed Plaintiff's removal and the ultimate decision was in Becker's hands.  *See* ECF No. 70-19; *see Barnes*, 2025 WL 915564, at *4 ("[T]he fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." (quoting *Lewis*, 653 F. Supp. 2d at 79)); *Terveer*, 34 F. Supp. 3d at 119 ("[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity

52

cannot be evidence of retaliation."). Accordingly, Plaintiff cannot show that Willis retaliated against her.[23]

## IV.   CONCLUSION

Plaintiff has failed to create an issue of material fact as to whether she was discriminated or retaliated against in violation of Title VII or the ADEA. Her insistence that she can show that her termination (or the events leading up to is) were a pretext for discrimination by establishing that managers failed to comply with Chapter 43 of Title 5 of the U.S. Code is unpersuasive and she has failed to marshal evidence that would permit a reasonable factfinder to determine that they were motivated by unlawful discrimination. Indeed, her arguments foreground a theory that she was terminated so that managers could capture her salary to reorganize the division in which she worked and promote her first-line supervisor. That may be unfair or unscrupulous or mercenary, but it would not be a violation of Title VII or the ADEA. Her retaliation claims also fail, most obviously for reasons related to timing: Plaintiff theorizes a scheme to dismiss her that pre-dates her protected activity and did not involve the ultimate decisionmaker. More, it is undisputed that the person she primarily accuses of retaliation—her first-line supervisor—did not have notice of her protected activity at the time of the alleged reprisals he had a hand in. And, having failed to create an issue of material fact on those claims, she obviously is not entitled to summary judgment on them.

Accordingly, the undersigned recommends **GRANTING** Defendant's motion for summary judgment, ECF No. 70, and **DENYING** Plaintiff's cross-motion for summary judgment, ECF No. 72.

---

[23] The undersigned notes that, even if there were no timing problem, Plaintiff fails to establish that Willis had a retaliatory motive for the same reasons that she fails to establish that the SEC's articulated non-discriminatory reason for her dismissal is pretextual: She identifies no appropriate comparators who were treated differently than she was; she has not shown that the SEC deviated from its normal practice; and she offers no other evidence of retaliatory motive.

\*     \*     \*     \*     \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED**.

Date:   May 8, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

54